COLORADO COURT OF APPEALS                                    **2016COA97**

---

Court of Appeals No. 13CA0032
City and County of Denver District Court No. 11CR2819
Honorable Sheila A. Rappaport, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jonathan Ray McFee,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HARRIS
Webb and Ashby, JJ., concur

Announced June 30, 2016

---

Cynthia H. Coffman, Attorney General, Jay C. Fisher, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Anne Stockham, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Jonathan Ray McFee was convicted of first degree murder in the stabbing death of his girlfriend, L.E.  At trial, the district court admitted her prior statements to family members recounting McFee's threats to kill her.  The court also admitted a note written by L.E. shortly before her death in which she said that McFee had threatened her and predicted that he would eventually follow through on those threats.

¶ 2     McFee contends that admission of these statements constituted an evidentiary error that deprived him of a fair trial and that admission of the note violated his rights under the Sixth Amendment's Confrontation Clause.  We agree that the note was a testimonial statement and that its admission violated McFee's constitutional rights.  But, in part because we determine that the remaining statements were properly admitted, we conclude that the constitutional error was harmless beyond a reasonable doubt.

¶ 3     We reject McFee's remaining contentions of error and therefore affirm the judgment.

## I.   Background

¶ 4     L.E. was the in-house manager of a residential facility for patients with HIV and AIDS.  Late one night, a resident discovered

L.E. lying in a pool of blood in the hallway. By the time police arrived, she had died from multiple stab wounds. Police discovered the bloody murder weapon — a fifteen- inch knife from the facility's kitchen — jammed underneath L.E.'s bedroom door.

¶ 5 A few months later, the police arrested McFee for the murder. He and L.E. had been in a long-term relationship and had been living together at the facility until shortly before L.E.'s murder. By all accounts, the relationship was volatile. Numerous witnesses testified at trial that they had heard McFee threaten to kill L.E. Members of her family testified that L.E. had recounted repeated threats by McFee and had told them that she was afraid of him. Shortly before the murder, L.E. wrote a statement implicating McFee and gave it to her cousin for safekeeping.

¶ 6 When he was arrested, McFee was driving L.E.'s car and, although the couple had apparently broken up a couple of days before the murder, he had a key to the facility on his key ring. According to the prosecution's evidence, there were no signs of burglary or forced entry into the facility on the night of L.E.'s murder.

¶ 7 McFee was interviewed briefly by the police after his arrest. During a break in the interview, while he was alone in the room, the audio recording equipment picked up some of his mumbled words that sounded like, "I did it. That bitch."

¶ 8 Police later tested the murder weapon. McFee's DNA was discovered on the handle of the knife.

¶ 9 The jury convicted McFee of first degree murder, and he was sentenced to life in prison without the possibility of parole.

## II. Hearsay

¶ 10 Hearsay statements are out-of-court statements offered in evidence at trial to prove the truth of the matter asserted. CRE 801(c). If the declarant of the statement is not available to be cross-examined, the out-of-court statement is generally deemed unreliable and, therefore, inadmissible, unless it falls within an exception to the prohibition on hearsay. CRE 802.

¶ 11 Some, but not all, hearsay statements implicate a defendant's Sixth Amendment rights under the Confrontation Clause. *Davis v. Washington,* 547 U.S. 813, 821 (2006). In *Crawford v. Washington,* 541 U.S. 36, 53-54 (2004), the Supreme Court held that the Confrontation Clause bars admission of *testimonial* statements of a

witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821; *see also Crawford*, 541 U.S. at 51 ("[N]ot all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted.").

### A. The Hearsay Statements

¶ 12    Over McFee's objection, L.E.'s mother testified that, on the evening of the murder, she spoke with L.E. on the phone. She testified that L.E. said McFee had threatened to kill her, and that "there's going to be trouble. . . [b]ecause [McFee's] acting like he used to act before." L.E.'s mother said that L.E.'s voice was trembling and that she sounded afraid during the call.

¶ 13    L.E.'s daughter testified that, two days before L.E.'s murder, she had a telephone conversation with L.E. during which L.E.

4

confided that she was afraid of McFee and felt unsafe. L.E.'s daughter advised L.E. to lock all of the doors and windows.

¶ 14    L.E.'s cousin testified that she was present during a phone call from McFee to L.E. that occurred about a month before L.E.'s murder. According to the cousin, L.E. was crying during the call and, afterwards, she told the cousin that she was afraid of McFee because he had threatened to kill her. The cousin suggested that L.E. write a statement and agreed to hold it for her. L.E. prepared the following handwritten statement:

> Driver's #98-324-056, Jonathan Ray McFee,
> 5/8/77, 5'6" wt 230, eyes brown. To whom it
> may concern, I am given [sic] this information
> to my cusin [sic] because this man has given
> me threts [sic] on me and where I live. He says
> he is going to kill me, its [sic] just a matter of
> time. [Signature of L.E.]

Immediately after learning of L.E.'s murder, the cousin turned the written statement over to the police, and it was introduced at trial over McFee's objection.

¶ 15    McFee contends that the district court abused its discretion in admitting L.E.'s hearsay statements to her mother, daughter, and cousin because the statements concerning McFee's threats did not fall within any exception to the rule against hearsay. With respect

5

to the note, McFee argues that the statement is testimonial and its admission therefore violated his rights under the Confrontation Clause. We reject the first contention but agree with McFee as to the second.

### B. Admission of L.E.'s Statements to Her Family Members

¶ 16    The district court determined that all of L.E.'s statements were admissible under CRE 807 — the residual exception to the hearsay prohibition — and noted that they were "arguably admissible" under CRE 803(3) — the state of mind exception. We agree with the district court that L.E.'s statements to her family members were properly admitted under Rule 807.

### 1. Standard of Review

¶ 17    Trial courts have considerable discretion in determining the admissibility of evidence, including application of the residual hearsay exception. *Vasquez v. People*, 173 P.3d 1099, 1106 n.7 (Colo. 2007). We will not disturb the trial court's evidentiary ruling absent an abuse of discretion. *Id.* A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, *People v. Brown*, 2014 COA 155M-2, ¶ 18, or is based on an

erroneous understanding or application of the law. *People v. Casias*, 2012 COA 117, ¶ 17.

2. Discussion

¶ 18 Under Rule 807, a hearsay statement not covered by any exceptions to the prohibition on hearsay established in CRE 803 and 804 is admissible if the statement has "equivalent circumstantial guarantees of trustworthiness" and a court determines that

> (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

CRE 807.

¶ 19 In evaluating the trustworthiness of a statement, we examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made. *Brown,* ¶ 20.

¶ 20    We are guided in our assessment by *People v. Fuller*, 788 P.2d 741 (Colo. 1990), a case with substantially similar facts. In *Fuller*, a close friend of the murder victim testified to a conversation with the victim that occurred two weeks before her death in which the victim reported that the defendant had choked her and threatened to kill her. *Id.* at 743. The supreme court determined that the statements were supported by circumstantial guarantees of trustworthiness because they were "spontaneous statements to [a] close friend[] that she had known for many years," they were "not self-serving," and the declarant "had no motive to lie." *Id.* at 745-46. Further, the statements established the material fact that the defendant had a motive to kill the victim, and they were particularly probative because they described actual incidents of violence by the defendant against the victim. *Id.* at 746.

¶ 21    L.E.'s statements are trustworthy for the same reasons: they were made spontaneously to close family members, were not self-serving, and L.E. had no motive to lie about McFee's threats. *See id.* at 745-46; *see also People v. Jensen,* 55 P.3d 135, 139 (Colo. App. 2001); *cf. Brown,* ¶ 31 (collecting cases in other jurisdictions applying the residual hearsay exception that find statements to

8

family members and close friends about marital matters trustworthy, even in the case of a heated divorce).

¶ 22    In addition, L.E. had personal knowledge of the threats she described, and there was no reason to question her ability to perceive or recount the threats. *See Jensen*, 55 P.3d at 139-40. And all of the witnesses also testified that when L.E. was recounting the threats, she appeared genuinely afraid and upset: her mother testified that L.E.'s voice trembled; her daughter thought she sounded "nervous and unsafe"; and her cousin testified that she was crying. Thus, L.E.'s demeanor at the time of the statements corroborates their content.[1]

¶ 23    Further, the statements relaying McFee's prior threats were offered to establish the material fact that the relationship between

---

[1] The trial court relied on other corroborating evidence, such as the presence of McFee's DNA on the knife handle, to find that the statements were sufficiently reliable. However, the supreme court has made clear that the existence of unrelated corroborating evidence "is not an appropriate 'circumstantial guarantee' supporting the reliability" of statements admissible under the residual hearsay exception. *Vasquez v. People*, 173 P.3d 1099, 1107 (Colo. 2007). Rather, "[t]he reliability of a statement should be determined by the circumstances that existed at the time the statement was made." *Id.* Thus, the court erred in relying on corroborating evidence independent of L.E.'s reporting of the threats. But because the statements were reliable for other reasons, this error is harmless. *See id.*

L.E. and McFee was volatile and that McFee had a motive for the murder. "In a homicide trial, evidence of prior threats, mistreatment, or malice by the defendant toward the victim is admissible to show the defendant's motive and culpable mental state." *Id.* at 140.

¶ 24 As McFee appears to concede, L.E.'s statements were more probative than the testimony of other witnesses who heard McFee express an intent to harm L.E. Her statements made clear that McFee was not just "blowing off steam" with friends when he said he wanted to kill L.E.; instead, L.E.'s statements established that McFee had communicated those threats directly to her and that she took them seriously. *See Fuller*, 788 P.2d at 746 (finding that the victim's statements were highly relevant because they described actual incidents in which the defendant acted violently).

¶ 25 Finally, the interests of justice were served by admission of the statements because "they were reliable and they increased the likelihood that the jury would ascertain the truth." *Id.*; *Jensen*, 55 P.3d at 140 ("[T]he interests of justice are also promoted by having the complete facts surrounding an incident available to the jury.").

¶ 26    In sum, L.E.'s statements to her family members in which she communicated McFee's threats satisfy Rule 807's requirements. Because the court properly admitted the statements under Rule 807, we need not address whether they were also properly admitted under Rule 803(3).

### C.  Admission of the Written Note

¶ 27    The district court considered, but rejected, McFee's argument that L.E.'s note was a "testimonial" statement for purposes of the Confrontation Clause analysis.  We agree with McFee that the district court erred in its determination, but we conclude that the error was harmless beyond a reasonable doubt.

### 1.  Standard of Review and Preservation

¶ 28    We review de novo whether the admission of evidence violated a defendant's rights under the Confrontation Clause.  *People v. Phillips*, 2012 COA 176, ¶ 85.  A preserved constitutional error requires reversal unless the People prove beyond a reasonable doubt that the error was harmless.  *Hagos v. People*, 2012 CO 63, ¶ 11.

¶ 29    The People contend that McFee objected to admission of the note on hearsay grounds, but not on the ground that the note was

11

testimonial and that its admission would constitute a violation of his confrontation rights. Thus, they urge us to review the Confrontation Clause claim for plain error.

¶ 30    Ordinarily, a general hearsay objection is insufficient to preserve a Confrontation Clause claim. *See People v. Vigil*, 127 P.3d 916, 929 (Colo. 2006). But here, McFee's objection prompted the district court to consider whether L.E.'s note was a testimonial statement that implicated McFee's confrontation rights under the Sixth Amendment.

¶ 31    A claim is preserved for appeal if the trial court was "presented with an adequate opportunity to make findings of fact and conclusions of law" on the issue. *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004); *cf. People v. Syrie*, 101 P.3d 219, 223 n.7 (Colo. 2004) ("*In the absence of such findings and conclusions*, we will not consider arguments injecting an issue not adequately presented to the trial court.") (emphasis added). The purpose of the contemporaneous objection rule is to conserve judicial resources by alerting the trial court to a particular issue so that it has an opportunity to correct any error. *People v. Pahl*, 169 P.3d 169, 183 (Colo. App. 2006). An objection is sufficiently specific when it

12

draws the court's attention to the asserted error. *Martinez v. People*, 2015 CO 16, ¶¶ 13-14. Where, despite imprecision in the objection, the trial court actually rules on the claim raised on appeal, and makes findings of fact and conclusions of law, the claim is sufficiently preserved. *See People v. Rhea*, 2014 COA 60, ¶ 55 (issue preserved where trial court was sufficiently on notice of the issue); *see also Battle N., LLC v. Sensible Hous. Co.*, 2015 COA 83, ¶ 13 (despite ambiguity in the request to the trial court, where the trial court ruled on the issue brought on appeal, the issue was preserved).

¶ 32     Thus, because the trial court specifically addressed the Confrontation Clause claim and determined that none of the hearsay statements, including the note, were testimonial, the Confrontation Clause claim is properly preserved, and we will review any error under the constitutional harmless error standard.

## 2. Discussion

¶ 33     The Sixth Amendment's Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Because the provision applies to "witnesses" against the

accused — those who "bear testimony" — the Confrontation Clause is implicated only when "testimonial" hearsay statements are at issue. *Crawford*, 541 U.S. at 51 (citation omitted).

¶ 34    We determine whether a hearsay statement is testimonial by considering whether, in light of all of the circumstances, viewed objectively, the statement was made "with a primary purpose of creating an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. ___, ___, 135 S. Ct. 2173, 2180 (2015) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)); *Arteaga-Lansaw v. People*, 159 P.3d 107, 109 (Colo. 2007) (whether a statement is testimonial is "ultimately a function of [its] purpose").

¶ 35    The Clause applies to volunteered statements as well as statements obtained through questioning, *see Davis*, 547 U.S. at 822 n.1, and to documents. *See Bullcoming v. New Mexico*, 564 U.S. 647, 660-61 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009). In each case, we must determine whether the declarant's purpose was to establish facts that might be relevant to a later criminal prosecution. *Davis*, 547 U.S. at 822; *see Hinojos-Mendoza v. People*, 169 P.3d 662, 667 (Colo. 2007) (lab report was testimonial because its sole purpose was to analyze a substance in

14

anticipation of criminal prosecution); *People v. Merritt*, 2014 COA 124, ¶ 44 (autopsy report was testimonial because it was created primarily for the purpose of gathering evidence to use in the eventual prosecution of a murder suspect).

¶ 36    Statements may be testimonial even if they are not made to law enforcement officers. *Clark*, 576 U.S. at ___, 135 S. Ct. at 2181. What matters is whether, in light of the relevant circumstances, the statement was made for the requisite purpose. *Id.*

¶ 37    The relevant circumstances include whether there was an ongoing emergency at the time the statements were made, the formality and spontaneity of the statements, the environment in which the statements were given, and the identity of the person to whom the statements were made. *Id.*; *see also Phillips*, ¶ 70. And in evaluating the purpose of the statements, we consider the purpose that a reasonable declarant in those circumstances would have had, rather than the declarant's subjective or actual purpose. *People v. Medrano-Bustamante*, 2013 COA 139, ¶ 41 (*cert. granted* Sept. 8, 2014).

¶ 38    The attendant circumstances demonstrate that L.E. intended the note to aid in the prosecution of McFee and to serve as a

15

substitute for her trial testimony in the event of her death. *See Clark*, 576 U.S. at ___, 135 S. Ct. at 2180.

¶ 39 Statements are nontestimonial when made for the purpose of enabling police to address an ongoing emergency. *Davis*, 547 U.S. at 822. But L.E. did not write the note during an emergency, and she did not seek immediate police intervention. The note did not relay "what is happening," in an effort to get help, but instead recorded "what happened," and what she thought would eventually happen based on McFee's prior conduct. *See id.* at 830 (distinguishing nontestimonial statements to a 911 operator about current threats from testimonial statements to police officers about past events). Although the note recounted L.E.'s fear for her life and her belief that McFee would eventually kill her, it did not relay an "immediate danger." *See Arteaga-Lansaw*, 159 P.3d at 109 (Statements were testimonial because "any danger or need for immediate assistance ha[d] passed."); *Raile v. People*, 148 P.3d 126, 133 (Colo. 2006) (no ongoing emergency, and thus statements were testimonial, where declarant did not ask for help and was not in current danger).

¶ 40    L.E.'s purpose in writing the note was not to seek help to prevent an imminent attack by McFee (indeed, McFee was apparently incarcerated at the time) but to ensure that, if he attacked her in the future, police could find him and punish him. To that end, the note was more than a mere casual remark or statement. *Cf. Clark*, 576 U.S. at ___, 135 S. Ct. at 2181 (nontestimonial statements were "informal and spontaneous"); *Phillips*, ¶¶ 116, 122 (informal questioning produced nontestimonial statements). In addition to accusations of past criminal conduct and the prediction that McFee would make good on his threats, the note provided information from McFee's driver's license, including a physical description, that would have helped police locate and identify him if L.E. were unable to assist them. And the note bore L.E.'s signature, much like an affidavit, though less formal. These features of the note demonstrate that L.E.'s primary purpose in writing it was to aid in the investigation and prosecution of McFee in the event of her murder.

¶ 41    Though L.E. gave the note to her cousin, and not directly to someone principally charged with uncovering and prosecuting criminal behavior, we conclude that the note falls into that narrow

category of testimonial statements not made to police. *See Clark*, 576 U.S. at ___, 135 S. Ct. at 2181-82 (observing that statements made to third parties not charged with investigating or prosecuting crimes are "significantly less likely to be testimonial," but declining to "adopt a categorical rule excluding them from the Sixth Amendment's reach"). The note may have been addressed "to whom it may concern," but law enforcement officers were surely its intended recipients. Indeed, after learning of L.E.'s murder, her cousin immediately gave the note to investigators. She reasonably understood the note as intended for law enforcement in the event of L.E.'s death, and this understanding is reflected by her testimony that she hoped the note would give L.E. "comfort." In this way, L.E.'s cousin was a mere conduit to the police — L.E. may not have sent her statement directly to police, but she clearly intended that it be conveyed to them by her cousin if her dire prediction came true. *Cf. People v. Richter*, 977 N.E.2d 1257, 1281-82 (Ill. App. Ct. 2012)(discussing "conduit theory" whereby a statement communicated to a third party is the equivalent of a statement communicated to police for purposes of Confrontation Clause analysis).

¶ 42    Other courts have characterized similar notes as testimonial

statements.  In *State v. Sanchez*, 177 P.3d 444 (Mont. 2008), the

defendant was charged in the shooting death of his girlfriend.  The

prosecution introduced a note written by the victim shortly before

her death:

> To whom it concerns:
>
> On July 8, 04 around 10:30 p [sic] Raul
> Sanchez Cardines told me if I ever was cought
> [sic] with another man while I was dating him,
> that he would kill me. . . .
>
> So if I unexspetly [sic] become sick and on the
> edge of death, and perhaps I die no [sic] you
> will have some answers.
>
> [Signature of victim.]

Id. at 447.

¶ 43    In concluding that the note qualified as a testimonial

statement, the Montana Supreme Court observed that its purpose

was to explain the victim's untimely death, not to prevent or

mitigate future harm.  The note could establish or prove facts to

"answer questions regarding how, why, and by whom she had been

harmed or killed."  *Id.* at 452-53.  And, like the note here, the note's

substance and "comprehensive salutation" demonstrated that the

19

victim's intended audience was law enforcement officials, even though the note was not directly addressed to the police. *Id.* at 453.

¶ 44 The victim in *State v. Jensen*, 727 N.W.2d 518 (Wis. 2007), wrote a note and gave it to her neighbor with instructions to turn it over to the police if anything happened to her. In the note, addressed to the city police department and two named detectives, the victim wrote, "if anything happens to me, [the husband] would be my first suspect. . . . I pray I'm wrong [and] nothing happens . . . but I am suspicious of [the husband's] . . . behaviors [and] fear for my early demise." *Id.* at 522. The victim's husband was later charged with first degree murder in the poisoning death of the victim, and the prosecution sought to introduce the note at his trial. *Id.* at 520-22. The supreme court characterized the note as testimonial on the ground that a reasonable person in the victim's position would have anticipated that the note — which accused her husband of murder and even referred to him as a "suspect" — would be used against him at a later trial. *Id.* at 527-28.

¶ 45 Finally, in *Miller v. Stovall*, 608 F.3d 913 (6th Cir. 2010), *cert. granted, judgment vacated, and case remanded*, 565 U.S. ___, 132

S. Ct. 573 (2011)[2], the declarant committed suicide after helping the defendant kill her husband.  He left behind a suitcase containing evidence of the conspiracy and a suicide note that also implicated the defendant.  The Sixth Circuit concluded that because the declarant had deliberately assembled evidence of the crime and, in the suicide note, instructed that the evidence be delivered to the police, it was foreseeable that the suicide note would also be used in the prosecution of the defendant.  *Id.* at 925.  Accordingly, the note was a testimonial statement and its admission at trial violated the defendant's Sixth Amendment rights.  *Id.* at 926.

¶ 46     Like the notes at issue in *Sanchez, Jensen,* and *Miller,* L.E.'s note was clearly intended to be used as a substitute for her testimony in the event McFee followed through on his threats to kill her.  The record does not suggest any explanation for the note, other than a desire and intent by L.E. to provide proof of facts that would assist the police in a later prosecution.  *See United States v. Brooks,* 772 F.3d 1161, 1170 (9th Cir. 2014) ("[O]ur conclusion that

---

[2] This judgment was vacated, pursuant to *Greene v. Fisher,* 565 U.S. __, 132 S. Ct. 38 (2011), due to an error in the Sixth Circuit's application of federal habeas corpus principles.  No subsequent history casts doubt on the court's Confrontation Clause analysis.

the primary purpose [of the statement] was investigative is reinforced by the lack of an alternative. That is, if the purpose of [the statement] was not to build a case for prosecution, then what was the purpose?"); *Jensen*, 727 N.W.2d at 527-28 (noting that the district court "[couldn't] imagine any other purpose in sending a letter to the police that is to be opened only in the event of [the victim's] death other than to make an accusatory statement given the contents of this particular letter").

¶ 47    Thus, because the primary purpose of the note was to create an out-of-court substitute for trial testimony and aid in police investigation, we conclude that the note was testimonial. And because the victim was unavailable at trial[3] and McFee had no prior

---

[3] Under the doctrine of forfeiture by wrongdoing, a defendant may forfeit his Sixth Amendment right to confront witnesses against him if the witness's unavailability is the result of the defendant's wrongdoing. The doctrine requires proof that the defendant "acted with the intent to deprive the criminal justice system of evidence," *Vasquez*, 173 P.3d at 1104, and is therefore inapplicable "in cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying — as in the typical murder case involving accusatorial statements by the victim." *Giles v. California*, 554 U.S. 353, 361 (2008). Here, there was no allegation, or indication in the record, that McFee murdered the victim to prevent her from testifying or offering evidence in any case. Accordingly, McFee did not forfeit his confrontation rights.

22

opportunity for cross-examination, the admission of the note violated McFee's confrontation rights.[4]

¶ 48    However, we further conclude that this error was harmless beyond a reasonable doubt. "The inquiry in a harmless error analysis is 'whether the guilty verdict actually rendered in this trial was surely unattributable to the error,' and 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered.'" *Phillips*, ¶ 93 (quoting *People v. Fry*, 92 P.3d 970, 980 (Colo. 2004)). In determining whether a violation of the Confrontation Clause is harmless beyond a reasonable doubt, we consider "(1) the importance of the statements to the prosecution's case, (2) the cumulative nature of the statements, and (3) the overall strength of the prosecution's case." *People v. Frye*, 2014 COA 141, ¶ 16 (quoting *People v. Allen*, 199 P.3d 33, 37 (Colo. App. 2007)); *accord Arteaga-Lansaw*, 159 P.3d at 110.

¶ 49    While the note was highly probative evidence that McFee had previously threatened to kill L.E., and that she believed he was

_____

[4] Because we conclude that the court erred in admitting the note, we need not decide McFee's contentions that the trial court should have given a limiting instruction circumscribing the permissible inferences the jury could draw from the note, and that the note contained multiple levels of hearsay.

23

serious, the court properly admitted statements from L.E.'s cousin, mother, and daughter, who all testified that L.E. had told them that McFee had threatened to kill her, and that she was afraid of him. In addition, four other witnesses had either overheard McFee threatening to kill L.E. or testified that McFee himself told them that he wanted to kill her. Thus, the statements in the note — that McFee had threatened L.E. and that she feared he would kill her — were properly introduced through other witnesses. *See Arteaga-Lansaw*, 159 P.3d at 111 (Confrontation Clause error was harmless beyond a reasonable doubt because the improperly admitted statement was cumulative of the testimony of three other witnesses).

¶ 50    And McFee's threats were not the only evidence of his motive nor the only evidence that he had committed the crime. Several witnesses testified that McFee was jealous and controlling and that his relationship with L.E. was marked by acrimony and bouts of rage. As well, McFee's DNA was on the murder weapon; he possessed a key to the residence; there was no evidence of forced entry on the night of the murder; and he failed to contact L.E.'s daughter, with whom he had a parental-type relationship, after the

24

murder. As for the recorded police interview, whether McFee said "they think I did it" or "I did it" was contested. But the jury listened to the audiotape and might well have heard the latter (and the jurors surely heard McFee call L.E. "a bitch," as that was undisputed).

¶ 51 Given all this, we are confident that the verdict was not attributable to the erroneous admission of L.E.'s note. We therefore conclude that the error was harmless beyond a reasonable doubt. *See Raile*, 148 P.3d at 135 (Confrontation Clause error was harmless beyond a reasonable doubt where improperly admitted statements were similar to other statements presented at trial and statements were not critical to prosecution's case).

### III. Limitation on Cross-Examination

¶ 52 McFee contends that the trial court also violated his confrontation rights by improperly limiting the scope of his cross-examination of a prosecution witness.

¶ 53 Carlos Grider, a resident at the facility, discovered L.E.'s body and called 911. He testified that he had seen McFee at the facility that afternoon and evening. Grider also said that a couple of months before the murder, McFee had told him that "he loved [the

victim], but he hated her," and that he wanted to stab her, and he had called her a bitch.

¶ 54     On cross-examination, Grider acknowledged that his testimony on direct examination was, at times, inconsistent with, or included details not provided in, his prior statements to the police. He also conceded that, just before trial, he told investigators for the first time that he had seen McFee near the residence right before he discovered L.E.'s body.  He attributed the inconsistencies and the late disclosures to his mental health problems.  Grider said that he suffered from mental illness, and the discovery of L.E.'s body led to "post-traumatic stress [and] a whole lot of different things."  He described the experience as "very traumatizing," and as a result, his "memory ha[d] not been the very absolute best" in that "some parts [were] very clear, [but] some parts [were]  very vague."

¶ 55     McFee contends on appeal that the district court erred in prohibiting him from asking Grider additional questions about his mental health — specifically, whether he had been found incompetent to stand trial three years before L.E.'s murder and whether, at the time of trial, he was on any medication.

26

## A. Standard of Review

¶ 56    A defendant has a constitutional right to confront and cross-examine witnesses, *Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo. 2009), but the right is not absolute or unlimited. *People v. Larsen*, 2015 COA 157, ¶ 30. The scope and limits of cross-examination are matters within the sound discretion of the trial court, and absent an abuse of that discretion, we will not disturb the court's rulings on appeal. *People v. Conyac*, 2014 COA 8M, ¶ 91.

## B. Discussion

¶ 57    The district court determined that an incompetency finding three years before the murder was too remote to be relevant. We agree.

¶ 58    A witness's prior mental health condition is relevant for impeachment purposes only if the witness suffered from the condition close in time to the events at issue. *See United States v. Diecidue*, 603 F.2d 535, 551 (5th Cir. 1979) (prior incompetency determination and subsequent treatment for mental illness were not probative, and therefore properly excluded on cross-examination, where competency determination occurred twelve years before incident at issue); *see also United States v. Kohring*,

637 F.3d 895, 910 (9th Cir. 2011) (mental health of witness not relevant for impeachment when proponent of evidence does not establish or allege that the witness suffered from mental instability at the time of the alleged crime); *United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) ("Rather, federal courts appear to have found mental instability relevant to credibility only where, *during the time-frame of the events testified to*, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth.") (emphasis added); *Velasquez v. United States*, 801 A.2d 72, 80 (D.C. 2002) (precluding evidence of the witness's mental condition three years after the offense where there was no evidence that the condition persisted at the time of the trial); *State v. Stewart*, 925 P.2d 598, 602 n.3 (Utah Ct. App. 1996) (noting that "[m]any other courts also have concluded that evidence of a witness's mental health history which is not contemporaneous with the witness's observations or testimony in the case is irrelevant and inadmissible" and collecting cases).

¶ 59     *United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009), the case McFee relies on, is consistent with this authority.  In *Robinson*,

the confidential informant (the "government's star witness," without whose testimony "Robinson could not have been convicted," *id.* at 1267) was involuntarily committed to a mental health facility six days before trial. The informant appeared as a witness, presented himself as a conscientious member of the law enforcement team, and attributed his memory loss to the lapse of time between the offense and the trial. The district court prohibited defense counsel from cross-examining the informant about his mental health.

¶ 60    In fact, the informant was abusing illegal and prescription drugs at the time of his admission to the mental health facility and might have been "under the influence at the time of the alleged firearm sale." *Id.* at 1272. He also had a long history of mental health problems and, at the time he was hospitalized, was suffering from auditory and visual hallucinations and was experiencing psychosis, conditions that would have affected his "ability to perceive or to recall events or to testify accurately." *Id.* at 1275 (citation omitted).

¶ 61    The Tenth Circuit reversed. The court emphasized that the mental health testimony sought by the defendant concerned events that occurred "*just days* before trial began," *id.*, and would have

called into question the informant's ability to "observe, remember, and recount." *Id.* at 1276. And because "the guilty verdict in th[e] case depended upon the [informant's] testimony," there was a reasonable probability that the result would have been different if the defendant had had access to the informant's mental health records and an opportunity to cross-examine him on that basis. *Id.* at 1271.

¶ 62 Here, we are presented with substantially different facts that require a different resolution. The incompetency finding occurred three years before L.E.'s murder and four years before Grider testified as a witness. *See United States v. Infelise*, 1992 WL 7835, at *1 (N.D. Ill. Jan. 8, 1992) (because evidence of mental incapacity of a witness must relate to the time period about which the witness will testify, evidence of hospitalization for drinking three years after relevant events and three years before trial was not relevant). McFee did not argue, much less produce evidence tending to show, that Grider's ability to recall events or testify accurately was compromised because of the earlier incompetency finding.

¶ 63 Perhaps more to the point, Grider admitted during cross-examination that his memory was vague as to certain details, based

on mental health problems including post-traumatic stress.  Thus, the earlier incompetency finding was cumulative (and less probative) of his testimony.  *See People v. Campos*, 2015 COA 47, ¶ 36 (no error for court to limit cross-examination where proposed questions concerned areas already covered).  The problem in *Robinson* was that the informant's unchallenged testimony left the jury with a mistaken impression about his ability to testify accurately.  Here, Grider acknowledged that his ability to recount certain events at the time of the murder was affected by his mental health issues.  And, unlike the informant's testimony in *Robinson*, Grider's testimony was hardly the linchpin of the prosecution's case against McFee.

¶ 64    We likewise perceive no abuse of discretion by the district court in precluding a question about Grider's then-current use of prescription medications.  McFee did not present a good faith basis to ask the question.  Nor did he argue to the district court that medication compromised Grider's ability to "testify lucidly at trial," *Robinson*, 583 F.3d at 1273 (citation omitted).  And Grider's use of medications at the time of trial — if any — had no bearing on his ability to perceive or process events that occurred a year earlier.

31

¶ 65    In any event, as we have noted, Grider had already

acknowledged that his memory of that evening was not perfect due

to subsequent mental illness and trauma.  *Cf. id.* at 1272-73

(evidence of witness's use of prescription medication relevant to

rebut his testimony that memory lapses were due solely to passage

of time).  Thus, whether Grider was on prescription medication

during trial was both irrelevant and cumulative.  *Campos,* ¶ 36.

¶ 66    We therefore discern no error in the court's limitation on

cross-examination.

IV.    Admission of Lay Opinion Testimony Regarding McFee's
Recorded Statement

¶ 67    Approximately two weeks after the murder, McFee voluntarily

submitted to a recorded interview with the police.  While the

detective was out of the room, the recording equipment captured

McFee saying something to himself.

¶ 68    At trial, the detective testified that when he played the

recorded interview, he thought he heard McFee say: "What do I

need to give a statement about?  Motherfucker.  I did it.  That

bitch."  He had the audio recording enhanced to eliminate

background noise, and, according to his testimony, the enhanced

version confirmed what he thought he had heard. The prosecution played both the unenhanced and enhanced versions of the recording for the jury.

¶ 69 At trial, McFee objected to the detective's testimony on the ground that the jury could simply watch the video: "Judge, it's my understanding that we're reviewing the video and they are likely to introduce it. I think that's the best evidence, not his testimony about what he viewed on that video." On appeal, he contends that the court admitted the testimony in violation of CRE 701 because the detective was in no better position than the jury to hear and interpret McFee's words.

## A. Standard of Review

¶ 70 Ordinarily, we review the district court's evidentiary rulings for an abuse of discretion. *People v. Warrick*, 284 P.3d 139, 141 (Colo. App. 2011). And, if we discern an error, we will reverse only if the error was not harmless. *People v. Robles*, 302 P.3d 269, 274 (Colo. App. 2011), *aff'd*, 2013 CO 24. But here, we agree with the People that McFee's objection in the district court on "best evidence" grounds was not sufficient to preserve a claim of error under CRE 701. *See People v. Robinson*, 908 P.2d 1152, 1156 (Colo. App.

1995) (objection to officer's testimony under CRE 701 did not preserve claim that district court violated best evidence rule), *aff'd,* 927 P.2d 381 (Colo. 1996). We therefore review the district court's decision to admit the testimony under a plain error standard of review. *Id.*

¶ 71 Plain error is error that is obvious and substantial, and that so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos,* ¶ 14.

## B. Discussion

¶ 72 In the district court, the prosecution did not offer any basis for admission of the testimony, but, on appeal, the People claim that its introduction was proper under CRE 701. We disagree.

¶ 73 Under CRE 701, a lay witness may testify to opinions or inferences so long as they are (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

¶ 74 A lay witness may give a summary opinion of another person's behavior, motivation, or intent if the witness had sufficient

34

opportunity to observe the person and to draw a rational conclusion about the person's state of mind. *People v. Jones*, 907 P.2d 667, 669 (Colo. App. 1995). For example, a lay witness can opine that a person appeared to be "getting ready to hit" someone. *Elliott v. People*, 176 Colo. 373, 377, 490 P.2d 687, 689 (1971).

¶ 75 And a witness can testify regarding the identity of a person depicted in a photograph or on a videotape if there is some basis for concluding that the witness is more likely to correctly identify the defendant than is the jury. *Robinson v. People*, 927 P.2d 381, 384 (Colo. 1996).

¶ 76 Lay opinion testimony is permitted under Rule 701 because "it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013) (citation omitted). But here, the jury was in precisely the same position as the detective to hear and interpret the words spoken by McFee on the recording. The detective was neither present when McFee uttered the words nor so familiar with McFee's voice that he was more likely to correctly

35

identify the contested words. His opinion could not have been helpful to the jury because it was based on exactly the same information the jury had: the original recording and the enhanced recording. A witness, lay or expert, may not form conclusions for jurors that they are competent to reach on their own. *See id.* at 597 (error to admit agent's testimony about the meaning of common words spoken by defendant during recorded phone calls).

¶ 77    While a lay witness may, under certain circumstances, provide opinion testimony regarding an ultimate issue to be decided by the trier of fact, the witness cannot be called merely for the purpose of "tell[ing] the jury what result to reach." *People v. Collins*, 730 P.2d 293, 306 (Colo. 1986). The detective's testimony was nothing more than a suggestion that the jury interpret McFee's words as "I did it," rather than as "they think I did it."

¶ 78    Still, even if we assume that the error was obvious, we discern little, if any, prejudice from the testimony, and certainly not the kind of prejudice that would cast doubt on the reliability of the verdict. Ordinarily, the risk of admitting improper lay opinion testimony of this type is that the jurors will assume that the witness is in a better position to interpret or understand the

36

evidence than they are (otherwise, why has the witness been called to testify?). *See Freeman*, 730 F.3d at 596 (noting that several courts of appeals have recognized that "there is a risk when an agent 'provides interpretations of recorded conversations based on his knowledge of the entire investigation . . . that he [is] testifying based upon information not before the jury'" and thus the jury will defer to the witness's interpretation) (alteration in original) (citation omitted). But here, the detective was presented as simply a thirteenth set of ears, albeit a set of ears belonging to a police officer. The jury listened to both recordings and was instructed to come to its own conclusion about what McFee had said.

¶ 79    Accordingly, while it was improper for the detective to state an opinion as to the words uttered by McFee, the jury had no reason to accept his opinion and could evaluate McFee's words for itself. *Cf. Collins*, 730 P.2d at 305 (witness may opine on ultimate issue because jury is free to disregard the opinion).

## V. Blood Stain Pattern Analysis and Crime Scene Reconstruction Expert

¶ 80  McFee contends that the district court erred in admitting testimony by the prosecution's blood pattern expert that was beyond the scope of his expertise.  We disagree.

### A. The Expert's Testimony

¶ 81  At trial, the prosecution endorsed an expert in "blood stain pattern analysis and crime scene reconstruction."[5]  The expert offered two opinions that McFee contends were beyond the scope of his expertise: first, that the circumstances of the crime scene indicated that the victim knew her attacker, and second, that the stabbing was particularly violent and suggested "overkill."

¶ 82  With respect to the testimony concerning the identity of the attacker, the prosecutor asked "whether or not [L.E.] may or may

---

[5] The record does not clearly reflect the scope of the witness's expertise for which he was qualified by the court.  After an objection by defense counsel that the detective's expert report covered only bloodstain pattern analysis, and not crime scene reconstruction, the court agreed that the expert should be bound by his report but determined that he would be "qualified as an expert in the crime scene analysis, in terms of blood work."  Later, the prosecutor offered the detective as an expert in both fields, and the court qualified him without any further limitation.  Any ambiguity regarding his areas of expertise, however, does not affect our analysis.

not have known the person that did that to her[.]" Defense counsel's objection was sustained.

¶ 83    However, on cross-examination, defense counsel twice pointed out that the expert knew, as he was conducting his investigation, that someone known to L.E. had been arrested for the crime. He then asked the expert if he was familiar with the concept of confirmation bias.

¶ 84    On redirect, the prosecutor asked, "Counsel was asking you about the fact that the assailant was known to the victim, and whether or not that affected your determination or not, I think was the question." She continued, "[W]hat about this scene indicated to you, other than the information you had that he was potentially known to the victim, that, in fact, the assailant was known to the victim?" In response to defense counsel's objection, the court ruled, "I think you can ask him . . . that the information that he received was that someone known to the victim had been arrested, and did that influence your opinion, yes or no?" The prosecutor argued that she should be able to ask whether the scene was consistent with his opinion that the attacker knew the victim, in light of defense counsel's suggestion that the expert's opinion was improperly

affected by confirmation bias. The court agreed and the expert testified as follows:

> Q: Detective, counsel was asking you about the effect the knowledge had on you that you were given information that the person that was arrested, or the suspect, was known to the victim.
>
> First of all, let me ask you: did that have any effect on your reconstruction or your opinion in this case?
>
> A: No, ma'am.
>
> Q: And based on your evaluation of the evidence and the scene, was that consistent with your opinion?
>
> A: Yes, ma'am.

¶ 85    With respect to the "overkill" testimony, the prosecution asked whether the expert had formed any opinion about the crime based on the nature of the wounds inflicted. The expert responded, "[I]t's my opinion, not just based on the reconstruction, just the sheer violence and overkill and the depth of the wounds, that –." When the prosecution asked for a definition of "overkill," defense counsel objected on the ground that the response was beyond the expert's area of expertise. The court ordered the prosecutor to rephrase, and the expert testified as follows:

> Q: You indicated something to the effect of the depth of the wounds, and this was overkill. What does that mean?
>
> A: Well, almost like, just what it states: This is overkill. Not only does she have stab wounds, but she has stab wounds within stab wounds. This was just anger.

Defense counsel's objection to the answer was overruled.

### B. Standard of Review

¶ 86     We review a trial court's decision to admit expert testimony for an abuse of discretion, and will not overturn the court's ruling unless it is manifestly erroneous. *People v. Douglas*, 2015 COA 155, ¶ 58. This broad discretion "reflects the superior opportunity of the trial judge to gauge both the competence of the expert and the extent to which his opinion would be helpful to the jury." *People v. Williams*, 790 P.2d 796, 798 (Colo. 1990) (citation omitted). Whether opinion testimony is within a particular witness's expertise is also a matter addressed to the sound discretion of the trial court. *People v. Watson*, 53 P.3d 707, 711 (Colo. App. 2001).

¶ 87     Because defense counsel made a contemporaneous and specific objection, if we determine that the district court abused its

discretion, we review for harmless error. *See Hagos*, ¶ 12. Under a harmless error analysis, we reverse only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. *Id.*

## C. Discussion

¶ 88 A witness must be qualified as an expert before testifying about his or her expert opinions. *People v. Stewart*, 55 P.3d 107, 124 (Colo. 2002). Even after a witness has been qualified as an expert, however, the witness's expert opinion testimony must still be limited to the scope of his or her expertise. *See Melville v. Southward*, 791 P.2d 383, 388 (Colo. 1990); *People v. Gomez*, 632 P.2d 586, 593 (Colo. 1981).

¶ 89 The trial court did not err in permitting the expert to testify that the crime scene was consistent with the theory that the victim knew her attacker. The district court sustained defense counsel's objection to the prosecutor's questioning, but when defense counsel raised the issue on cross-examination, it was proper for the district court to allow the prosecutor to attempt to "dispel any unfavorable innuendo" created by the expert's testimony on cross-examination. *Gomez*, 632 P.2d at 593 (citation omitted). Once defense counsel

injected the issue of confirmation bias into the trial, the prosecutor was entitled to try to show that, contrary to defense counsel's suggestion, the expert's opinion was not based entirely on improper, unscientific biases. *Cf. Golob v. People*, 180 P.3d 1006, 1012-13 (Colo. 2008) (explaining that one party's questioning of an expert witness may "open[] the door" to otherwise inadmissible evidence). Under these circumstances, the court did not err in permitting the expert to testify that the crime scene was consistent with the fact that someone known to the victim had been arrested for her murder.

¶ 90    As for the "overkill" testimony, we need not decide whether the court erred in admitting the expert's testimony because any error was surely harmless. The expert's observation that L.E. sustained "wounds within wounds" was essentially cumulative of the properly admitted testimony of the medical examiner who performed the autopsy. The medical examiner testified that some of L.E.'s wounds had "multiple wound tracks," indicating that the knife went into the body, came out of the body, and then went back in at a slightly different angle. Thus, the jury was already aware, from a properly qualified expert, that the victim suffered "wounds within wounds."

When evidence is merely cumulative, any error in its admission is harmless. *People v. Russell*, 2014 COA 21M, ¶ 27 (*cert. granted* Feb. 23, 2015); *People v. Herdman*, 2012 COA 89, ¶ 61 (inappropriate expert testimony was harmless because, among other reasons, it was cumulative to that of other expert witnesses); *see also Gonzales v. Windlan*, 2014 COA 176, ¶ 33 (any error in admitting expert testimony was harmless because it was cumulative of other properly admitted expert testimony).

¶ 91    The medical examiner, however, could not conclude if the multiple wound paths were caused by the victim moving, the attacker making up and down motions with the knife, or some combination of the two. But based on the bloodstain evidence, the expert testified, without objection, that L.E. was stationary when she was stabbed, and that there were no signs of a struggle. Thus, considering the expert's testimony in light of the medical examiner's testimony, the jury would have reasonably inferred that the attacker repeatedly stabbed L.E. in the same place. That repeated stabbing is a sign of anger is a further logical inference that the jury

would have drawn, regardless of the expert's testimony.[6]  *See People v. Martinez*, 2015 COA 37, ¶ 27 (Improperly admitted evidence was harmless because it merely stated "the most logical inference from the evidence.").

¶ 92    Accordingly, any error in admitting the expert's brief reference to evidence of "overkill" was harmless.[7]

## VI.    Conclusion

¶ 93    The judgment is affirmed.

JUDGE WEBB and JUDGE ASHBY concur.

---

[6] Indeed, even before the expert's testimony, a juror question noted that "this act was the personification of hate."

[7] We disagree with the People that *People v. Ruibal*, 2015 COA 55 (*cert. granted* Feb. 29, 2016), is dispositive.  In that case, a division of this court concluded that the district court properly determined that a pathologist's testimony regarding "overkill" evidence was reliable under Rule 702.  *Id.* at ¶¶ 31-32.  But here, McFee's argument is that, whether or not the evidence is scientifically valid, this particular expert was not qualified to testify about it.