The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 31, 2018

## 2018COA79

**No. 2016CA0854 — Constitutional Law — Fifth Amendment — Double Jeopardy; Crimes — Murder in the First Degree — Inchoate Offenses — Criminal Attempt**

When a defendant attempts to deliberately kill one person but mistakenly kills a different person and is convicted of both the attempted murder of the intended victim and the actual murder of the unintended victim, a division of the court of appeals concludes that the attempted murder conviction must be vacated because it is a lesser included offense of the murder conviction.

The division also affirms the trial court's rulings granting the prosecution's motion for a mistrial, admitting an unavailable witness's statements under the doctrine of forfeiture by wrongdoing and CRE 807, and rejecting the defense's proposed complicity instruction.

The judgment is affirmed in part and vacated in part, and the case is remanded for correction of the mittimus.

COLORADO COURT OF APPEALS      **2018COA79**

Court of Appeals No. 16CA0854
Arapahoe County District Court No. 14CR1968
Honorable Frederick T. Martinez, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Brandon D. Jackson,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE FREYRE
Terry and Navarro, JJ., concur

Announced May 31, 2018

Cynthia H. Coffman, Attorney General, Matthew S. Holman, First Assistant
Attorney General, Nicole D. Wiggins, Assistant Attorney General, Denver,
Colorado, for Plaintiff-Appellee

Eric A. Samler, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1     Defendant, Brandon D. Jackson, appeals the judgment of conviction for first degree murder after deliberation, attempted first degree murder after deliberation, attempted first degree murder with extreme indifference, conspiracy to commit first degree murder, and accessory.  The court declared a mistrial after defense counsel elicited undisclosed alibi evidence during Jackson's ex-wife's cross-examination.  In a second trial, a jury convicted him as charged.

¶ 2     Jackson challenges the trial court's decision to declare a mistrial over his objection.  He also contends that at the second trial, the court erred in (1) allowing testimonial hearsay under the forfeiture by wrongdoing doctrine; (2) rejecting his tendered complicity instruction; and (3) imposing separate convictions and sentences for attempted murder after deliberation and murder after deliberation — a novel issue raised by the unique facts of this case.  We affirm in part, vacate in part, and remand for correction of the mittimus.

I.     Background

¶ 3     Jackson and his friends, Amin El-Howeris, Devon Grant-Washington, Bruce Roberts, Quinten Sauls, Tyrel Walker,

and Roderick Ruben, were members of "Sicc Made," a subset of the Crips gang. Victim E.O. belonged to a rival gang called "Most Hated." In August 2011, members of Most Hated fired gunshots into Jackson's apartment. At a party on the night of December 23 and into the morning of December 24, 2011, E.O. shot El-Howeris, but El-Howeris survived.

¶ 4    On the night of December 25, 2011, and into the early morning hours of December 26, Jackson, El-Howeris, Grant-Washington, Roberts, Sauls, Walker, and Ruben gathered at Aisha Amin's apartment to discuss retaliating against E.O. Sauls said, "They mess with one of us, they mess with all of us." They passed around a black gun with a laser sight and discussed killing E.O. They knew where E.O. lived and that he drove a gold SUV. The men left in two Ford Explorers — Jackson drove the green Ford Explorer with Sauls as his passenger. The others left in a blue Ford Explorer. They met at E.O.'s apartment complex and Grant-Washington got into the green Ford Explorer with Jackson and Sauls. Cell phone tower records placed Jackson, Roberts, and Grant-Washington at the same location.

2

¶ 5    Victim Y.M. lived in E.O.'s apartment complex.  He arrived home from work at 3 a.m. driving a gold SUV similar to E.O.'s and parked across the street from E.O.'s apartment.  Believing Y.M. was E.O., either Sauls or Grant-Washington got out of Jackson's car, walked over to the SUV, and shot Y.M. twice in the head, killing him instantly.  When they realized they had killed the wrong man, the men turned and fired numerous shots into E.O.'s apartment.

## II.    Mistrial — Double Jeopardy

¶ 6    Jackson first challenges the court's decision to declare a mistrial after cross-examination of Leah Jackson (his ex-wife) revealed an undisclosed alibi defense.  He contends that the trial court failed to consider less drastic alternatives, that no manifest necessity for a mistrial existed, and that his retrial is barred by double jeopardy.  We perceive no grounds for reversal.

### A.    Additional Facts

¶ 7    Five months after Y.M.'s murder, Law Enforcement Investigator Kim Johnston interviewed Ms. Jackson concerning Jackson's whereabouts the previous December.  Ms. Jackson said Jackson had spent the night at her house either on December 24 into December 25 or on December 25 into December 26.  The

investigator said she knew it "had to have been the 24th into the 25th."

¶ 8    Several years later and in preparation for the trial of a codefendant, a different investigator re-interviewed Ms. Jackson. Ms. Jackson said that Jackson spent the night with her on Christmas Eve and was at her house when she left the next morning to visit her parents. When she returned at 8 p.m., Jackson was gone and she did not recall him coming to her house the next day, December 26.

¶ 9    Unbeknownst to the prosecution, approximately one month before the first trial, Ms. Jackson contacted the defense to provide new information. She told defense counsel and a defense investigator that she was now certain that Jackson had spent the night of December 25 with her and that he woke up at her house the morning of December 26, contrary to the information contained in the two previous reports. She explained that she came home from her parents' house and had to clean her house. She finished cleaning late — between 11 p.m. and midnight — and that Jackson arrived shortly thereafter. The defense did not endorse an alibi defense or move to continue the trial to do so.

¶ 10     During opening statement, the prosecutor explained that Jackson did not shoot Y.M. and that he sought a conviction based on complicity. He said the evidence would show that Jackson and the others spent the evening of December 25 into the early morning of December 26 discussing and planning to retaliate against E.O. by killing him. This meeting occurred at Amin's apartment. The defense waived opening statement and did not reveal its theory of defense.

¶ 11     During the prosecution's case, Ms. Jackson testified on direct examination that Jackson stayed overnight on Christmas Eve and that they opened presents with their kids Christmas morning. She said "after that, I got the kids dressed and I got myself dressed and we left to my mom's early, around 10:00." She returned home later that night — "probably like around 10:00, between 9:00 and 10:00" — and Jackson was not there.

¶ 12     During cross-examination, Ms. Jackson confirmed the same sequence of events. However, she then added, when asked, that Jackson had returned later that night and spent the night of December 25 with her. Defense counsel asked her the following:

> DEFENSE COUNSEL: And as you're sitting here today, Ms. Jackson, is there any doubt in your mind that it was Christmas night, the early morning hours of the 26th, that Mr. Jackson came back to your house?
>
> MS. JACKSON: I have no doubt.

¶ 13 Following cross-examination and in a bench conference, the prosecutor objected to this new information and said, "This is clearly alibi information. We received no notice of an alibi defense by the defense." He explained that the new testimony placed Jackson with his ex-wife, rather than at Amin's apartment when the killing was planned or at E.O.'s apartment complex. The prosecutor moved for a mistrial and argued that less drastic alternatives would not undo the prejudice created to its case.

¶ 14 Defense counsel argued that she was not pursuing an alibi defense or requesting an alibi instruction. She explained that the cross-examination concerned Ms. Jackson's initial statement to Investigator Johnston and was intended to rebut Ms. Jackson's direct examination concerning when Jackson stayed at her house. Defense counsel denied trying to "come in on the 11th hour and provide an alibi."

¶ 15    The court said it had three potential options: (1) instruct the jury that this was not alibi evidence; (2) strike the testimony; or (3) declare a mistrial. It noted that no one had asked the crucial question — whether Jackson ever left Ms. Jackson's house the morning of December 26.

¶ 16    The court questioned Ms. Jackson outside the jury's presence concerning how and when this information was disclosed to the defense. Ms. Jackson said she had provided the new information to the defense "last month" and confirmed she had never revealed it to the prosecution. The prosecutor renewed his mistrial motion. He asserted that (1) the defense had violated its Crim. P. 16 obligation to disclose this alibi evidence; (2) a twenty-four to forty-eight hour delay would be insufficient time to investigate and to remedy the prejudice; and (3) striking the testimony would be insufficient because the "bell just can't be unrung at this point and it's not something that can just be sanitized or scrubbed from the jury's mind" given that the jury already heard the evidence. Defense counsel objected to the mistrial, but otherwise agreed with the alternate remedies of striking the testimony or instructing the jury. The court deferred ruling until the end of Ms. Jackson's testimony.

¶ 17　　On redirect examination, Ms. Jackson then confirmed that Jackson was with her the entire night and had never left during the early morning hours of December 26.　She also revealed that she initiated contact with the defense to provide the new information and denied having done so at Jackson's behest.

¶ 18　　The court then ruled that although it had a variety of potential remedies, it believed a mistrial was appropriate "as a result of the defendant's misconduct."　It found that the information was new, it constituted alibi evidence, and it had never been disclosed to the prosecution.　The court found that these circumstances amounted to manifest necessity to declare a mistrial, explaining that it did not know how the prosecution could recover from evidence in the defense's possession for more than a month that was sprung on it midtrial.

### B.　Standard of Review and Relevant Law

¶ 19　　A trial court has broad discretion in ruling on a mistrial motion, and we will not disturb the court's decision in the absence of an abuse of discretion resulting in prejudice to the defendant. *People v. Chastain*, 733 P.2d 1206, 1213 (Colo. 1987).　A trial court is better able than a reviewing court to determine whether improper

testimony had any adverse effect on the jury. *People v. Ellis*, 30 P.3d 774, 777-78 (Colo. App. 2001).

¶ 20 Declaring a mistrial is "the most drastic of remedies" and is warranted only when the prejudice is too substantial to be remedied by other means. *See People v. Santana*, 255 P.3d 1126, 1132 (Colo. 2011); *see also People v. Pagan*, 165 P.3d 724, 728 (Colo. App. 2006). The Federal and Colorado Double Jeopardy Clauses bar a retrial unless the defendant consents to the mistrial or the mistrial is legally justified. U.S. Const. amend. V; Colo. Const. art. II, § 18; *People v. Berreth*, 13 P.3d 1214, 1216 (Colo. 2000).

¶ 21 A trial court is justified in declaring a mistrial when the circumstances amount to "manifest necessity" or when it finds, in its discretion, that the ends of public justice would not be served by continuing the proceedings. *People v. Segovia*, 196 P.3d 1126, 1133 (Colo. 2008); *see also Berreth*, 13 P.3d at 1216.

¶ 22 Manifest necessity includes circumstances that are "substantial and real, [and] that interfere with or retard 'the administration of honest, fair, even-handed justice to either, both, or any, of the parties to the proceeding.'" *Segovia*, 196 P.3d at 1133 (quoting *People v. Castro*, 657 P.2d 932, 942 (Colo. 1983)). The

General Assembly has identified circumstances where a mistrial is justified in section 18-1-301(2)(b), C.R.S. 2017. They include (1) a physical impossibility to proceed with the trial in conformity with the law; (2) a legal defect in the proceedings that would make any judgment entered upon a verdict reversible as a matter of law; (3) prejudicial conduct that has occurred in or outside the courtroom making it unjust to either the defendant or the State to proceed with the trial; (4) the jury's inability to render a verdict; and (5) a juror's false statement in voir dire. *Id.* The statute and cases establish that manifest necessity arises where circumstances are serious and outside of the court's control. *Segovia,* 196 P.3d at 1133. Moreover, a mistrial is justified only when other reasonable alternatives are no longer available. *Id.*; *Paul v. People,* 105 P.3d 628, 633 (Colo. 2005); *Doumbouya v. Cty. Court,* 224 P.3d 425, 428 (Colo. App. 2009).

## C. Application

¶ 23 We begin by noting that Jackson does not challenge the court's ruling that Ms. Jackson's testimony constituted alibi evidence. For our analysis, we presume that it is. A defendant may not elicit alibi evidence, absent good cause, without first complying

with the alibi disclosure requirements of Crim. P. 16 (II)(d). *See People v. Hampton*, 696 P.2d 765, 775-76 (Colo. 1985) (upholding the exclusion of alibi evidence under previous version of the rule when defense did not comply with disclosure requirements); *see also* Crim. P. 16(III)(g) (allowing the court to impose sanctions for a failure to comply with the rules); *People v. Greenwell*, 830 P.2d 1116, 1119 (Colo. App. 1992) (finding the district court did not abuse its discretion in excluding a defense witness not properly endorsed by the defense under the rules). Because the prosecution must often prove a defendant's presence during the commission of a crime, the rule's disclosure requirements are designed to provide the prosecution with adequate means to evaluate and meet the alibi testimony of defense witnesses. *Hampton*, 696 P.2d at 775.

¶ 24 The undisputed record shows that the defense provided no notice to the prosecution of Ms. Jackson's new claim that Jackson was with her during the planning and commission of the crimes, despite receiving it one month before trial. It also shows that the defense elicited this new information during Ms. Jackson's cross-examination in violation of Crim. P. 16(II)(d). We are not persuaded that the court's decision to permit Ms. Jackson's redirect

examination in front of the jury created the need for a mistrial because her response was unknown and, as the court noted, may have mooted the parties' arguments had she testified that Jackson left during the early morning hours of December 26.[1]  Instead, it was the defense's decision not to disclose the new information but nevertheless to elicit it on cross-examination in violation of Rule 16, which shows the circumstances giving rise to the mistrial were outside the court's control, and which supports the trial court's finding that the mistrial resulted from the defense's misconduct. *See Berreth*, 13 P.3d at 1217 ("[B]oth case law and statutory criteria show that circumstances must be serious and outside the control of the trial court in order to justify a finding of 'manifest necessity'" to justify a mistrial.); *see also State v. Carter*, 2016 WL 4268774, 2016-Ohio-5371 (Ohio Ct. App. 2016) (declaring a mistrial was not an abuse of discretion for defense's failure to properly disclose alibi evidence).

---

[1] For the same reasons, we reject Jackson's argument that the prosecutor's failure to object until the end of cross-examination created the prejudice.  Because the prosecutor did not know what Ms. Jackson would say, he could not object until the alibi evidence was elicited.

¶ 25    We next address and reject Jackson's contention that the trial court failed to consider less drastic alternatives to a mistrial. To the contrary, the record reveals that the court considered the factors set forth in *Segovia* and the statute. It discussed the possibility of striking the testimony, noting that the jury heard pure alibi evidence that Jackson was nowhere near the crime. Given the noncompliance with the disclosure rule and the significance of this new evidence, it found this option insufficient to cure the prejudice to the prosecution. *See Williamsen v. People*, 735 P.2d 176, 183 (Colo. 1987) ("Questions of the probative value and possible prejudicial impact of evidence are addressed to the sound discretion of the trial court, and the trial judge's rulings will not be disturbed absent a clear abuse of discretion.").

¶ 26    Implicit in the court's finding that striking the testimony would not ameliorate the prejudice was its determination that an instruction requiring the jury to disregard the evidence would be equally insufficient. Indeed, the court said it could not see how the prosecution could recover from what had been given to the defense a month earlier. *See Paul*, 105 P.3d at 633 (The trial court did not

13

abuse its discretion by implicitly determining that "other reasonable alternatives [were] no longer available.").

¶ 27    Next, the record shows that the trial court considered a short delay in the trial (forty-eight hours) for the prosecution to investigate and meet the new evidence. However, it found that the time required just to sort through the hundreds of jail calls to ascertain whether Jackson had influenced his ex-wife's new testimony would far exceed forty-eight hours. Noting that this was a cold case, the court found "the prosecution cannot reasonably be expected to attempt to uncover any impeachment information, . . . whether it [be] during trial or during a . . . break in the proceedings." After considering the factors outlined in *Hampton* — reason for nondisclosure, degree of culpability associated with nondisclosure, extent of prejudice to the other party, and reasonable lesser alternatives to exclusion of the alibi evidence — the court ultimately concluded that the alibi evidence was particularly significant because it completely exculpated Jackson from criminal conduct, and that justice to both parties could only "be served by either rebutting this information or the case being

dismissed if this alibi is, in fact, true." Noting this was not an easy decision, the court granted the People's request for a mistrial.

¶ 28    Because the trial court carefully considered the parties' arguments and its available options, and because it was in the best position to assess the prejudicial impact, we discern no abuse of discretion in its decision to declare a mistrial. To deprive trial courts of their ability to declare mistrials in circumstances such as these would cripple their ability to control and sanction counsel's conduct in their courtroom. *See Arizona v. Washington*, 434 U.S. 497, 513 (1978). Indeed, "[n]either party has a right to have his case decided by a jury which may be tainted by bias; in these circumstances, 'the public's interest in fair trials designed to end in just judgements' must prevail over the defendant's 'valued right' to have his trial concluded before the first jury impaneled." *Id.* at 516 (footnotes omitted) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949))).

¶ 29    Accordingly, we affirm the court's ruling declaring a mistrial.

### III. Walker's Hearsay Statements are Admissible Under the Doctrine of Forfeiture by Wrongdoing

¶ 30    Jackson next contends that the trial court erroneously admitted testimonial hearsay statements of uncharged co-conspirator Tyrel Walker to law enforcement officials under the doctrine of forfeiture by wrongdoing and under the residual hearsay exception, CRE 807. He argues that insufficient evidence shows that Walker's decision not to testify related to him and that Walker's statements were unreliable and therefore inadmissible. We disagree and conclude that (1) the prosecution proved by a preponderance of the evidence that Jackson forfeited his right to confront Walker and (2) the trial court did not abuse its discretion in admitting Walker's statements.

### A. Additional Facts

¶ 31    Walker spoke twice with Investigator Craig Tangeman about the shooting — first on February 23, 2012, and again on February 28, 2012. Walker disavowed any knowledge of the shooting in the first interview. However, during the February 28 interview, he admitted being with the group of people involved in the shooting. Walker said that Jackson drove the green Ford Explorer and that

16

Walker was a passenger in the blue Ford Explorer. Walker did not witness the shooting but heard the fired shots. According to Walker, after the shots were fired, Jackson drove up to the blue Ford Explorer, said that the wrong person had been shot, and said they then shot into E.O.'s apartment.

¶ 32 On August 18, 2015, Walker wrote a letter to the prosecution saying he did not want nor intend to participate in the upcoming trial. He explained that he was already serving a seventy-year prison sentence, that he was not a star witness, and that he did not remember the day or crime in question and would say so if brought to court. Thereafter, the prosecution moved to admit Walker's February 28 statements, alleging that Jackson had forfeited his right to confront Walker by causing him not to testify.

¶ 33 At the hearing, the prosecutor produced evidence of jail telephone calls between Jackson and other members of Sicc Made, as well as law enforcement officials' investigation concerning the identities of the persons named in the phone calls. That evidence revealed that Jackson's cousin, Mikey Clopton, was in the Sterling prison where Walker was also housed. In a phone call to Juhn Simmons (a Sicc Made member), Jackson asked Simmons to ask

17

Clopton to ask Walker if he intended to take the stand and also to relay that Walker was the prosecution's star witness. In a second call to Simmons, Jackson directed that Walker contact the defense investigator and "see if he's willing to recant, pretty much."

¶ 34 Jackson argued that the forfeiture by wrongdoing doctrine did not apply because the prosecution failed to prove that he caused Walker's unavailability with the intent to prevent him from testifying. He further argued that the statements constituted inadmissible hearsay. He makes the same arguments on appeal.

¶ 35 In a detailed oral order, the trial court found that (1) the prosecution proved, by a preponderance of the evidence, that Jackson forfeited his right to confrontation because he caused Walker's refusal to testify; and (2) Walker's statements were admissible under CRE 807.

B. Confrontation Clause and Forfeiture by Wrongdoing

1. Standard of Review and Applicable Law

¶ 36 We review de novo a trial court's ruling on whether a confrontation claim is barred under the forfeiture by wrongdoing doctrine. *Vasquez v. People*, 173 P.3d 1099, 1103 (Colo. 2007). We review for clear error the court's factual findings made at the

18

forfeiture hearing, and we will not disturb those findings unless they are clearly erroneous. *Id.* at 1105. A finding is clearly erroneous if it has no support in the record. *People v. Alaniz*, 2016 COA 101, ¶ 40.

¶ 37 We review a trial court's evidentiary rulings for an abuse of discretion. *See People v. McFee*, 2016 COA 97, ¶ 17. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it is based on an erroneous understanding or application of the law. *Id.*

¶ 38 A defendant forfeits his right to confront a witness at any proceeding in which the witness's statements are otherwise admissible where "a court finds that (1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to deprive the criminal justice system of evidence." *Vasquez*, 173 P.3d at 1103-04; *see also People v. Moreno*, 160 P.3d 242, 247 (Colo. 2007). The prosecution must prove, by a preponderance of the evidence, the elements of forfeiture by wrongdoing. *Vasquez*, 173 P.3d at 1105. Any forfeiture applies to confrontation rights under the Federal and Colorado Constitutions. *Id.* at 1101.

## 2.    Analysis

¶ 39    We conclude that the trial court applied the proper forfeiture test, weighing each of the three factors and assessing them in light of the proper preponderance burden.  *Vasquez*, 173 P.3d at 1104-05.

¶ 40    First, the parties do not dispute, and we conclude the record sufficiently shows, that Walker was unavailable.  Jackson's sole related argument is that the prosecution did not prove he directly caused Walker's unavailability.  He relies on the contents of Walker's letter, which he argues reflects Walker's voluntary decision not to testify and refers to no threats associated with testifying.  He further argues that *Giles v. California*, 554 U.S. 353 (2008), decided after his trial, limits the scope of the forfeiture by wrongdoing doctrine to circumstances where a defendant's sole purpose for silencing a witness is to prevent the witness from testifying.  Thus, he argues, even if there was some evidence that he wished Walker would not testify, the prosecution needed to prove Jackson had a specific intent to silence Walker.  Courts in other jurisdictions, however, have explicitly rejected this interpretation of *Giles.  See, e.g., United States v. Jackson*, 706 F.3d 264, 268 (4th Cir. 2013)

20

("The [*Giles*] Court made no mention of any requirement that the defendant's desire to silence the witness be the sole or primary motivation for his misconduct."); *People v. Banos*, 100 Cal. Rptr. 3d 476, 493 (Cal. Ct. App. 2009) ("[N]othing in *Crawford, Davis, Giles I* or *Giles II* suggests that the defendant's *sole* purpose in killing the victim must be to stop the victim from cooperating with authorities or testifying against the defendant. It strikes us as illogical and inconsistent with the equitable nature of the doctrine to hold that a defendant who otherwise would forfeit confrontation rights by his wrongdoing . . . suddenly regains those confrontation rights if he can demonstrate another evil motive for his conduct."); *State v. Supanchick*, 263 P.3d 378, 383 (Or. Ct. App. 2011) ("[T]he Court's opinion in *Giles* does not suggest that [a defendant's] sole or even primary purpose in making the victim unavailable must have been to prevent the victim from reporting defendant to the authorities or testifying against him."), *aff'd*, 323 P.3d 231 (Or. 2014). We agree with these courts and conclude that our supreme court's decision in *Vasquez* supports this view.

¶ 41    In *Vasquez*, 173 P.3d at 1103, the defendant killed his wife during the pendency of other criminal proceedings. He argued that

the prosecution was required to prove his intent to silence her testimony in each case separately, and that no intent evidence existed for the homicide case. Our supreme court rejected this narrow interpretation of the intent requirement and held that evidence of a defendant's interference with a witness can work a forfeiture of the defendant's confrontation rights in all proceedings in which the witness's statements are admissible. *Id.* Consistent with this holding, we conclude that Jackson's communications to Walker, through other members of Sicc Made, about whether he planned to "take the stand" and to contact the defense investigator to "recant" constitute sufficient evidence to establish his interference with Walker's testimony by a preponderance of the evidence. Moreover, the existence of other reasons for Walker's unavailability (as stated in his letter) does not alter our conclusion. *See id.* at 1104-05 ("[P]reventing the witness's testimony does not have to be the defendant's sole motivation, but need be only one reason for the defendant's actions.").

¶ 42　　As with the interference factor of *Vasquez,* the record sufficiently supports the trial court's factual findings that Jackson contacted others with the intent of depriving the court of key

22

evidence. Jackson described Walker as a "star witness" for the prosecution, and he said in one phone call that Walker "is their only witness against me, pretty much." These statements show that Jackson knew Walker possessed damaging evidence (irrespective of its truth). And, Jackson's request that Walker contact the defense investigator to "recant" evidences his intent to remove this damaging evidence from the trial.

¶ 43 We are not persuaded that *Moreno*, 160 P.3d 242 , requires a different result. There, the child victim was medically unavailable to testify due to the criminal conduct charged, so the trial court admitted the child's videotaped interview over the defendant's objection. The supreme court reversed, holding that a defendant does not forfeit his right to confrontation if the only evidence of wrongdoing is the offense itself, apart from any design or attempt to subvert the trial testimony. *Id.* at 246.

¶ 44 Unlike in *Moreno*, Walker's refusal to testify had nothing to do with the criminal conduct charged, but instead was motivated in part by Jackson's communications through Sicc Made intermediaries asking him to recant. As the forfeiture hearing unfolded, the trial court, as fact finder, was in the best position to

weigh the credibility of the witnesses and evidence presented, and we defer to its findings because the record supports them. *See People v. Friend*, 2014 COA 123M, ¶ 8 (trial courts are in the best position to determine questions of fact) (*cert. granted in part* Feb. 8, 2016).

¶ 45 Finally, because we affirm the trial court's ruling that Jackson forfeited his right to confront Walker, we need not address his argument that the introduction of Walker's statements to law enforcement officials infringed his right to confront Walker. *See Vasquez*, 173 P.3d at 1103.

## C. Hearsay

¶ 46 Jackson contends that the trial court erroneously admitted Walker's out-of-court statements under the residual hearsay exception, CRE 807. We disagree.

### 1. Standard of Review and Applicable Law

¶ 47 We review the trial court's evidentiary decisions, including whether the residual hearsay exception applies, for an abuse of discretion. *Vasquez*, 173 P.3d at 1106 n.7. A court abuses its discretion when its decision is manifestly arbitrary, unfair, or

unreasonable, or contrary to law. *See People v. Hoskins*, 2014 CO 70, ¶ 17.

¶ 48    CRE 807 provides that a statement not specifically covered by the other hearsay exceptions "but having equivalent circumstantial guarantees of trustworthiness" is not excluded by the prohibition against hearsay if certain requirements are met. A statement may be admitted under the rule if (1) it is offered as evidence of a material fact; (2) it is more probative on the point for which it is offered than any other evidence that could be reasonably procured; (3) the general purposes of the rules of evidence and the interests of justice are best served by its admission; and (4) the adverse party had adequate notice in advance of trial of the intention to offer it into evidence. *People v. Fuller*, 788 P.2d 741, 744 (Colo. 1990); *People v. Shifrin*, 2014 COA 14, ¶ 59.

¶ 49    "In considering the trustworthiness of a statement, courts should examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made." *People v. Jensen*, 55 P.3d 135, 139 (Colo. App. 2001); *see also Fuller*, 788 P.2d at 745. The proponent must

establish the trustworthiness of the statement by a preponderance of the evidence. *People v. Preciado-Flores*, 66 P.3d 155, 164 (Colo. App. 2002).

### 2.    Analysis

¶ 50    We discern no abuse of discretion in the court's admission of Walker's hearsay statements under CRE 807 and conclude that the trial court's findings, to which we defer, are supported by the record. *People v. Brown*, 2014 COA 155M-2, ¶ 29 ("[W]e defer to the trial court's findings of fact which are supported by the record.").

¶ 51    First, Walker's statements were evidence of a material fact — the circumstances surrounding the shooting and Jackson's involvement in it. Because Walker was present, heard the shots fired, and heard Jackson's inculpatory statements immediately following the shooting, and because Walker's statements were consistent with the physical evidence, his statements were more probative of what occurred at the apartment complex than the other circumstantial evidence that was available. Further, the jury's truth-finding function, and thereby the interests of justice, are better served by firsthand accounts. *See McFee*, ¶ 76 ("Lay opinion testimony is permitted . . . because 'it has the effect of describing

26

something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a firsthand witness to a particular event.'" (quoting *United States v. Freeman,* 730 F.3d 590, 595 (6th Cir. 2013))). Moreover, the undisputed record shows that the prosecution provided advance notice of its intent to admit Walker's hearsay statements.

¶ 52    Concerning indicia of reliability, the trial court found "from a lay perspective admitting to things that seem to be candid and true, and then . . . not [being] able to remember certain things based on his position or passage of time . . . has an indicia of reliability." It also found that Walker had no more motivation to implicate Jackson than any of the other individuals involved because Walker and Jackson were not close, although they knew each other. And, it found that the circumstances of the interview — specifically, that the prosecutor was making decisions about whom to charge — provided reliability to Walker's statements.

¶ 53    We are not persuaded by Jackson's argument that the trial court gave insufficient weight to Walker's motivation to avoid first degree murder charges himself, and "downplayed this rather

27

important factor." The record contradicts this assertion and shows that the court carefully analyzed each statement to determine its trustworthiness. The court specifically considered the impact of Walker's motive:

> [T]he question as to his motive is always going to be suspect, but I think that internally within the statement he circles back around in terms of time, place, location, he corroborates statements that he had made earlier, he came back to the same statements, he identified individuals that he was familiar with, and he also stated when he was not able to identify individuals. He identified the position of his vehicle, what his observations were, what he saw, what he heard, the fact that gunshots had rung out and that they left immediately after [Jackson] told him that this guy's house had been shot up and he describes the direction of travel. So based on the totality of circumstances, I will allow this evidence to come in.

¶ 54 The court acknowledged that while Walker may have been trying to avoid culpability, he nevertheless inculpated himself as a complicitor by admitting that he was at the scene, heard gunshots, heard Jackson's inculpatory statements, and thus was a participant.

¶ 55 For the same reasons, we reject Jackson's argument that the court improperly distinguished this case from *Bernal v. People*, 44

P.3d 184 (Colo. 2002), where our supreme court held that a co-conspirator's statements minimizing his own blame and maximizing others' did not possess the requisite "particularized guarantees of trustworthiness" to be admissible under CRE 804(b)(3). *Id.* at 197, 200. To be sure, Walker's statements minimized his participation in the actual murder; however, he admitted participating in the planning, driving to the apartment complex, and hearing gunshots. And, as found by the court, nothing in the record shows why he would implicate Jackson over the other participants.

¶ 56    Finally, the court noted that unlike in *Bernal*, where the witness made numerous inconsistent statements, Walker's statements remained consistent, even when the investigator moved on and then returned to earlier questions. True enough, Walker could not recall a number of details; however, unlike the circumstances in *Bernal,* the investigator never caught Walker in lies. *See id.* at 200 ("Even Grose, a detective and witness for the prosecution, recognized the untrustworthiness of [the codefendant's] statement. . . . Grose responded to the court's question of why [the codefendant] was upset during the interviews

29

with the following explanation: 'Because he was caught in several lies, and he was being confused as to time, where he was at. And he was getting frustrated because I was going back over his statements and he was changing his statements, and he was confused.").

¶ 57    Accordingly, we conclude that the decision to admit Walker's statements under CRE 807 was not manifestly unreasonable, arbitrary, or unfair.

IV.    Complicity Instruction

¶ 58    Jackson next contends that the complicity instruction was erroneous for three reasons. First, he asserts that the jury should have been required to find that he was aware the shooter was acting after deliberation and with the conscious objective to kill the victim. He also argues that a separate complicity instruction should have been given for each offense because each offense contained a different mens rea. Finally, he argues that the tendered complicity instruction allowed the jury to convict him of first degree murder after deliberation with a lesser mens rea than that possessed by the shooter. Because we are bound by our supreme court's decision in

*People v. Childress*, 2015 CO 65M, we conclude the complicity

instruction was proper.

## A.    Additional Facts

¶ 59    Jackson tendered the following complicity instruction:

> A person is guilty of an offense committed by
> another person if he is a complicitor.  To be
> guilty as a complicitor, the following must be
> established beyond a reasonable doubt:
>
> 1. The crime must have been committed,
>
> 2. another person must have committed all or
> part of the crime,
>
> 3. the defendant must have had knowledge
> that the other person intended to commit all or
> part of the crime,
>
> 4. the defendant be actually aware of or know
> that the principal was acting after deliberation,
> and with the conscious objective of causing the
> death of another,
>
> 5. the defendant must have had the intent to
> promote or facilitate the commission of the
> crime,
>
> 6. the defendant must have aided, abetted,
> advised, or encouraged the other person(s) in
> the commission or planning of the crime.

¶ 60    The tendered instruction included a source note at the bottom

that read as follows:

This instruction is not supported by *People v. Childress*, --- P.3d ---, 2015 WL 7423068 (Colo. 2015). However, this proposed instruction is being submitted in support of D-30 titled, "Motion to Find C.R.S. 1[8]-1-603 Unconstitutional on its Face And as Applied, or in the Alternative, Motion for an Alternative Jury Instruction."

¶ 61 During the instruction conference, defense counsel argued,

I understand the Court had denied the motion [to find section 18-1-603 unconstitutional], but I think the Court said I could still follow up with the jury instruction to create a record that we were seeking to introduce it. But I wanted to obviously note that this was not supported by the [*Childress*] case. It might have been supported by the dissent, but that has already been ruled upon by the Court.

¶ 62 The court denied Jackson's tendered instruction, ruling that (1) the fourth paragraph was subsumed within the third paragraph and (2) the fourth paragraph only considered the mens rea for first degree murder while the instruction applied to all charges.

¶ 63 The court instructed the jury as follows:

A person is guilty of an offense committed by another person if he is a complicitor. To be guilty as a complicitor, the following must be established beyond a reasonable doubt:

1. The crime must have been committed,

2. another person must have committed all or part of the crime,

32

3. the defendant must have had knowledge that the other person intended to commit all or part of the crime,

4. the defendant must have had the intent to promote or facilitate the commission of the crime,

5. the defendant must have aided, abetted, advised, or encouraged the other person(s) in the commission or planning of the crime.

### B. Standard of Review and Applicable Law

¶ 64 Trial courts have a duty to correctly instruct the jury on all matters of law. *People v. Garcia*, 28 P.3d 340, 343 (Colo. 2001). We review de novo whether jury instructions accurately reflect the law. *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011). Generally, instructions that accurately track the language of applicable statutes and pattern instructions are sufficient. *People v. Gallegos*, 260 P.3d 15, 26 (Colo. App. 2010). However, "pattern instructions are not law, not authoritative, and not binding on this court, but they are grounded in our longstanding practice and are regularly consulted to determine whether jury instructions are erroneous." *People v. Flockhart*, 2013 CO 42, ¶ 12.

¶ 65 Under the complicity statute, "[a] person is legally accountable as [a] principal for the behavior of another constituting a criminal

33

offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense." § 18-1-603, C.R.S. 2017. Section 18-1-603 therefore dictates

> that a person is legally accountable as a principal for the behavior of another constituting a criminal offense if he aids, abets, advises, or encourages the other person in planning or committing that offense, and he does so with: (1) the intent to aid, abet, advise, or encourage the other person in his criminal act or conduct, and (2) an awareness of circumstances attending the act or conduct he seeks to further, including a required mental state, if any, that are necessary for commission of the offense in question.

*Childress*, ¶ 34.

> With regard to causing a particular result that is an element of the offense in question, rather than mandating that a complicitor himself act with the kind of culpability otherwise required for commission of the offense, *complicitor liability* as defined by statute in this jurisdiction *mandates that the complicitor act with an awareness the principal is or would be acting with that required mental state.*

*Id.* at ¶ 29 (emphasis added). "[C]ircumstances attending the act or conduct," refers to "those elements of the offense describing the prohibited act itself and the circumstances surrounding its

commission, *including a required mental state*, if any." *Id.* (emphasis added).

## C. Application

¶ 66 We conclude that the tendered instruction properly required the jury to find that Jackson knew that the shooter intended to "commit all or part of *the crime*." A separate jury instruction defined first degree murder after deliberation:

> The elements of the crime of Murder in the First Degree (After Deliberation) are:
>
> 1. That the defendant,
>
> 2. in the State of Colorado, on or about December 26, 2011,
>
> 3. after deliberation, and
>
> 4. with the intent,
>
> 5. to cause the death of a person other than himself,
>
> 6. caused the death of that person or of another person.

"[A]fter deliberation" and "with the intent" "to cause the death of a person" are separate elements of "the crime." Thus, this instruction, when read with the complicity instruction, accurately required the jury to find that Jackson was aware that the shooter

acted after deliberation and with the intent to cause the death of the victim. Accordingly, we perceive no error in the complicity instruction.

¶ 67    Next, we address, and reject, Jackson's contention that the court should have tailored the complicity instruction to each offense by providing separate complicity instructions for each offense. Because Jackson makes this "separate instruction" argument for the first time on appeal, we review his argument for plain error. *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005).

¶ 68    First, Jackson does not cite, nor are we aware of, any authority requiring a separate complicity instruction for each offense to which complicity applies. Thus, the alleged error could not have been "obvious." *See People v. Pollard*, 2013 COA 31M, ¶ 40 (To be obvious, an error "must contravene (1) a clear statutory command; (2) a well-settled legal principle; or ([3]) Colorado case law.") (citations omitted). Additionally, the court instructed the jury that each count charged "a separate and distinct offense" and that "the evidence and the law applicable to each count had to be considered separately, uninfluenced by [the jury's] decision as to any other count." Because we presume the jury followed the court's

36

instructions, we similarly presume that it considered and applied

the complicity instruction to each count separately. *People v.*

*Moody*, 676 P.2d 691, 697 (Colo. 1984). Therefore, no error

occurred.

¶ 69    Finally, we conclude that Jackson preserved his "lesser mental

state" argument by arguing the unconstitutionality of section

18-1-603 both facially and as applied (though he does not challenge

the trial court's ruling denying those claims). However, we reject

his argument for the reasons described above and because we are

bound by *Childress*, which holds,

> with regard to crimes of specific intent[,] . . .
> the mental state requirements of
> complicity . . . arguably require a less culpable
> state of mind on the part of the complicitor
> than of the principal; and as a practical
> matter, any difference between having both the
> knowledge that the principal is acting with a
> conscious objective to cause a prohibited
> result and the design or desire to promote or
> facilitate that act, on the one hand, and
> actually having the conscious objective that
> the prohibited result occur, on the other, is
> largely academic. In any event, it could hardly
> be said that a complicitor's act of aiding,
> abetting, advising, or encouraging another
> person with both an awareness that the other
> person is engaging in behavior, the conscious
> objective of which is to cause a prohibited
> result, and a design that he do so, is any less

> culpable than having that conscious objective himself.

*Childress*, ¶ 32. Indeed, Jackson conceded as much in the source note on his tendered instruction and in his instruction conference argument. Accordingly, we conclude no error occurred.

## V. Double Jeopardy and Multiplicity

¶ 70 Jackson last contends that the court erred in imposing two convictions and consecutive sentences for his attempted murder convictions. He asks us to vacate one of the convictions and sentences. The People concede that the sentences for first degree murder and attempted first degree murder after deliberation should run concurrently, but argue that two convictions are justified because these convictions name different victims (Y.M. and E.O.). We agree with Jackson. To maximize the jury's verdict, we vacate his attempted first degree murder after deliberation conviction and sentence (because it is a lesser included offense of first degree murder after deliberation) and remand for correction of the mittimus.

A. Standard of Review and Relevant Law

¶ 71 We review unpreserved double jeopardy issues for plain error. *See Reyna-Abarca v. People*, 2017 CO 15, ¶ 47 ("[W]e conclude that an appellate court may review an unpreserved double jeopardy claim and that the court should ordinarily review such a claim for plain error."). Plain error is "'obvious and substantial,' and must have 'so undermined the fundamental fairness of the [proceeding] so as to cast serious doubt on the reliability of the judgment.'" *People v. Davis*, 2015 CO 36M, ¶ 32 (citations omitted).

¶ 72 The Double Jeopardy Clauses of the United States and Colorado Constitutions protect an accused against being twice placed in jeopardy for the same crime. U.S. Const. amend. V; Colo. Const. art. II, § 18; *Woellhaf v. People*, 105 P.3d 209, 214 (Colo. 2005). As pertinent here, the Double Jeopardy Clauses protect not only against a second trial for the same offense, but also "against multiple punishments for the same offense." *Woellhaf*, 105 P.3d at 214 (quoting *Whalen v. United States*, 445 U.S. 684, 688 (1980)).

¶ 73 Additionally, a defendant may not be convicted of an offense that is included in another offense. § 18-1-408(1), C.R.S. 2017. One offense is a lesser included offense of another offense "if the

39

elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense." *Reyna-Abarca,* ¶ 64. The lesser offense and greater offense may only stand "if the offenses were committed by distinctly different conduct." *People v. Rock,* 2017 CO 84, ¶ 17. Thus, if the same conduct led to the two convictions and establishing the greater offense establishes "any set of elements sufficient for commission of that lesser offense," then the lesser offense is included. *Id.* at ¶¶ 16-17.

¶ 74    To determine whether an offense is a lesser included offense, we examine the statutes at issue. In construing a statute, we must determine and effectuate the intent of the General Assembly. Whenever possible, we discern such intent from the plain and ordinary meaning of the statutory language. *Woellhaf,* 105 P.3d at 215.

¶ 75    Section 18-3-102, C.R.S. 2017, provides as follows:

> (1) A person commits the crime of murder in the first degree if:
>
> (a) After deliberation and with the intent to cause the death of a person other than

himself, he *causes the death of that person or of another person*; or

. . . .

(d) Under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby *causes the death of another* . . . .

(Emphasis added.)

¶ 76    Attempted first degree murder requires that the defendant engage in conduct constituting a substantial step toward the commission of first degree murder, as defined in section 18-3-102(1)(a) and (d).  *See* § 18-2-101(1), C.R.S. 2017 ("A person commits criminal attempt if, acting with the kind of culpability otherwise required for commission of an offense, he engages in conduct constituting a substantial step toward the commission of the offense.").

¶ 77    Finally, section 18-1-408 governs the prosecution of multiple counts for the same act.  It mandates that a defendant

may not be convicted of more than one offense if:

(a) One offense is included in the other . . . ; or

41

(b) One offense consists only of an attempt to commit the other; or

(c) Inconsistent findings of fact are required to establish the commission of the offense; or

(d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or

(e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods or instances of such conduct constitute separate offenses.

§ 18-1-408(1).

¶ 78     If a defendant is convicted and receives multiple punishments for the same offense, the convictions merge. *See People v. Rhea,* 2014 COA 60, ¶ 17 ("Merger has the same effect as vacating one of the multiplicitous sentences.").

## B.     Discussion

¶ 79     The prosecution charged Jackson with first degree murder after deliberation for killing Y.M. It also charged him with two counts of attempted first degree murder as to E.O. under different theories — after deliberation and extreme indifference. During closing arguments, the prosecutor urged the jury to convict Jackson of the two attempted murder counts based on the five

42

shots fired into E.O.'s apartment. He argued that Jackson's "substantial step" toward murdering E.O. was driving to E.O.'s apartment. On appeal, however, the People abandon this argument and instead assert that the shooting of Y.M. encompasses two separate crimes — first degree murder after deliberation and attempt — and that two convictions can be entered because the counts name separate victims (Y.M. for murder and E.O. for attempted murder).[2]

¶ 80    We first address and reject the prosecutor's argument in closing that was challenged by Jackson in this appeal.

¶ 81    Under that argument, both attempts were based on identical evidence — the five shots fired into E.O.'s apartment. Although we recognize our duty to maximize the jury's verdict, *see People v. Delgado*, 2016 COA 174, ¶ 29 (*cert. granted* Dec. 11, 2017), two convictions for attempted first degree murder based upon the same evidence and the same victim cannot stand. *See Candelaria v. People*, 148 P.3d 178, 180-81 (Colo. 2006) ("We therefore found that

_____

[2] The People may defend the judgment on any grounds supported by the record. *See People v. Aarness*, 150 P.3d 1271, 1277 (Colo. 2006).

43

the legislature intended to permit the same defendant to suffer only one conviction of murder for the killing of any single victim. We also considered it important, however, that the prosecution be permitted to charge multiple theories of first degree murder in separate counts . . . .") (citation omitted); *see also* § 18-1-408(1)(e) (One conviction must be vacated when "[t]he offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods or instances of such conduct constitute separate offenses.").

¶ 82    Contrary to the prosecutor's argument, the trial evidence does not support "distinct and separate offenses" for each shot fired. *Quintano v. People*, 105 P.3d 585, 592 (Colo. 2005). To determine whether each individual shot constitutes a separate offense, we examine whether the conduct occurred at different locations, was the product of new volitional departures, was separated by time, or was separated by intervening events. *Woellhaf*, 105 P.3d at 214; *Quintano*, 105 P.3d at 591. Because the evidence established that the five shots were fired in rapid succession, at the same location, not separated by time or any intervening events, and without a new

volitional departure, we conclude that identical evidence supports both attempted murder convictions and that only one may stand.

¶ 83    In response to the People's new argument, Jackson contends that we must still vacate one of the attempted murder convictions because attempted murder after deliberation is a lesser included offense of first degree murder after deliberation. The People contend that because the counts named different victims, section 18-1-408(3) (mandatory concurrent sentences for convictions supported by identical evidence) only requires the court to impose concurrent sentences to avoid a double jeopardy violation, but does not require that the conviction be vacated. This presents a novel issue not previously decided by a Colorado appellate court — when the greater and the lesser first degree murder offenses name different victims under the same theory, do principles of double jeopardy require one to be vacated? We answer that question "yes," based on the plain language of the first degree murder statute, which incorporates the doctrine of transferred intent, and conclude that double jeopardy requires that we vacate Jackson's conviction for the lesser included offense of attempted first degree murder after deliberation.

45

¶ 84    The facts of this case implicate the doctrine of transferred

intent because the victim killed was not the perpetrators' intended

target.  As described in *People v. Hunt*, 2016 COA 93, the doctrine

of transferred intent

>    is a legal fiction that is used to hold a
>    defendant criminally liable to the full extent of
>    his or her criminal culpability.  Traditionally,
>    the transferred intent theory has been applied
>    in so-called "bad aim" situations where a
>    defendant, while intending to kill one person,
>    accidentally kills an innocent bystander or
>    another unintended victim. . . .  Thus, the
>    perpetrator's intent to kill or injure a specific
>    victim transfers to the unintended victim.
>
>    . . . The purpose of the doctrine is to impose
>    criminal liability upon an actor when he or she
>    intends to commit a criminal act, and "the
>    actual result differs from the result designed or
>    contemplated only in that a different person or
>    property was injured or affected."

*Id.* at ¶ 24 (citations omitted).

¶ 85    The *Hunt* division recognized that the first degree murder

statute "incorporates the doctrine of transferred intent and holds a

principal liable for the death of an unintended victim" by its plain

language.  *Id.* at ¶ 21 (quoting *People v. Candelaria*, 107 P.3d 1080,

1091 (Colo. App. 2004)).  Indeed, as relevant here, the first degree

murder statute requires that the defendant "cause[] the death of

46

that person *or of another person.*"  § 18-3-102(1)(a) (emphasis

added).

¶ 86　　We recognize that one commentator suggests that the doctrine

of transferred intent is limited to "bad aim" cases and does not

apply to "mistaken identity" cases such as this.  *See* 1 Wayne R.

LaFave, *Substantive Criminal Law* § 6.4(d), at 475-78 (2d ed. 2003);

*see also Martinez v. State,* 844 S.W.2d 279, 282 (Tex. App. 1992)

(limiting the transferred intent doctrine to bad aim cases).

¶ 87　　However, others take a broader view finding that the purpose

of the doctrine is to impose criminal liability on a person who

commits a criminal act and "the actual result differs from the result

designed or contemplated only in that a different person or property

was injured or affected" without limiting it to bad aim cases.  Model

Penal Code § 2.03(2)(a) cmt. 3 (Am. Law Inst. 1985); *see also State*

*v. Austin,* 788 N.W.2d 788, 793 (Minn. Ct. App. 2010) (applying the

doctrine to mistaken identity facts and finding "[t]he doctrine

applies when a defendant claims that 'bad aim' or a mistaken

identity resulted in the crime affecting a victim other than the

intended victim").  Indeed, one commentator has suggested that the

need for the doctrine can be avoided altogether by incorporating the

doctrine into the statutory language. *See* 1 Paul H. Robinson, *Criminal Law Defenses* § 89(c) (1984) (describing how a homicide statute requiring an intent to cause the death of a person or another person includes the doctrine of transferred intent).

¶ 88 Because our General Assembly has chosen to include the doctrine of transferred intent within the language of the first degree murder statute, we are persuaded that the doctrine is implicated by the facts of this case and provides a useful framework for resolving the legal question presented, even though it involves mistaken identity rather than bad aim. We find support for our view in an old supreme court case where the court described the nearly universal rule that "one who kills another, mistaking him for a third person whom he intended to kill, is guilty or innocent of the offense charged the same as if the fatal act had killed the person intended to be killed." *Ryan v. People*, 50 Colo. 99, 102, 114 P. 306, 308 (1911) (quoting Francis Wharton, *The Law of Homicide* § 359 (Frank H. Bowlby ed., 3d ed.1907)).

¶ 89 Here, the undisputed evidence shows that the shooter and Jackson intended to kill E.O. and mistakenly killed Y.M., believing him to be E.O. Under the doctrine of transferred intent, Jackson's

specific intent to kill E.O. transferred to Y.M. and made him criminally liable for Y.M.'s death. *See State v. Fekete*, 901 P.2d 708, 714 (N.M. 1995) (finding that the perpetrator's intent to kill or injure a specific victim transfers to the unintended victim). By proving the first degree murder of Y.M. under this theory, the prosecution necessarily proved that Jackson intended and attempted to kill E.O. Therefore, the attempted murder of E.O. after deliberation is a lesser included offense of the murder after deliberation of Y.M. *Rock*, ¶¶ 16-17 (proving elements of the greater offense necessarily proves all the elements of the lesser offense); *see also* Crim. P. 31(c) ("The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."). And, because double jeopardy principles and section 18-1-408(1)(b) preclude convictions for both the lesser and greater offense, we conclude the error was obvious, substantial, and undermined the fairness of the proceeding. *Reyna-Abarca*, ¶ 81 ("[S]uch a violation requires a remedy.").

¶ 90    Accordingly, we vacate Jackson's attempted first degree murder after deliberation conviction.

## VI.    Conclusion

¶ 91    The judgment is affirmed as to the convictions of first degree murder after deliberation, attempted first degree murder with extreme indifference, conspiracy to commit first degree murder, and accessory.  The judgment for attempted first degree murder after deliberation is vacated, and the case is remanded for correction of the mittimus.  The mittimus should be amended to delete the conviction and sentence for attempted first degree murder after deliberation.

JUDGE TERRY and JUDGE NAVARRO concur.