22CA2249 Peo v Condon 11-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2249
Arapahoe County District Court No. 19CR251
Honorable Shay K. Whitaker, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Andrew Joseph Condon,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HAWTHORNE*
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 6, 2025

---

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Andrew Joseph Condon, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree murder, tampering with a deceased human body, aggravated motor vehicle theft, a crime of violence (sentence enhancer), burglary, assault, and menacing.  He contends that the district court erred by (1) admitting the victim's hearsay statements into evidence; (2) denying his motion to sever; (3) admitting evidence of prior acts without conducting the proper analysis; and (4) failing to properly instruct the jury.  He also contends that the prosecutor committed misconduct and that the alleged errors cumulatively deprived him of a fair trial.  We affirm.

## I.     Background

¶ 2     Condon and the female victim had been in an on-again, off-again relationship for approximately two years.  In December 2018, the couple was expected to arrive at the victim's parents' house to celebrate the holidays with her family, but they never arrived.  After several days without hearing from the victim, the victim's parents contacted her apartment manager to inquire whether her car was at the apartment complex.  The victim's car was not there.

¶ 3     On December 26, the victim's parents accessed her banking account and noticed that two withdrawals had been made from the account at gas stations in Texas on December 24 and 25 respectively.  Over the next several days, the victim's parents reported the missing victim and her stolen car to the Aurora Police Department.

¶ 4     Texas law enforcement officers later discovered Condon in the victim's car with her debit card in his possession.  When interviewed, Condon denied knowing what had happened to the victim or where she was located.

¶ 5     In January, a motorist found the victim's body inside a plastic storage bin hidden under a tree at an abandoned rest stop in Colorado.  The body was wrapped in duct tape and plastic bags, and law enforcement found Condon's fingerprints on the wrappings. At trial, a forensic pathologist testified that the victim died of strangulation and had a fractured hyoid bone in her throat.

¶ 6     The prosecution charged Condon with (1) first degree murder, § 18-3-102, C.R.S. 2018; (2) tampering with a deceased human body, § 18-8-610.5, C.R.S. 2018; (3) aggravated motor vehicle theft, § 18-4-409(2), (3)(a), C.R.S. 2018; (4) a crime of violence (sentence

enhancer), § 18-1.3-406(2)(a)(I)(B), C.R.S. 2025; (5) first degree

burglary, § 18-4-202(1), C.R.S. 2025; (6) second degree assault,

§ 18-3-203(1)(i), C.R.S. 2025; and (7) menacing, § 18-3-206(1),

C.R.S. 2018.

¶ 7     Condon did not testify at trial, but his counsel effectively

conceded that he caused the victim's death by arguing that

Condon's actions were merely reckless or negligent.

¶ 8     After trial, the jury acquitted Condon of first degree murder,

but it convicted him of the lesser included offense of second degree

murder, § 18-3-103(1), C.R.S. 2018, and the remaining offenses as

charged.  The district court sentenced Condon to seventy-one years

in the Department of Corrections' custody with five years of

mandatory parole.

## II.     Admission of the Victim's Out-of-Court Statements

¶ 9     Condon contends that the district court erred by admitting

into evidence the victim's testimonial hearsay statements.  We

disagree.

### A.     Additional Background

¶ 10     The prosecution provided pretrial notice of its intent to

introduce statements the victim made to police on November 3,

2018, and December 8, 2018, under CRE 807 and the forfeiture by wrongdoing doctrine. The court held an evidentiary hearing and heard testimony from Officers Henderson and Starz. The court also reviewed the officers' body worn camera footage, which captured their interviews with the victim on those dates.

¶ 11    *Incident 1: November 3, 2018.*  Officer Henderson responded to an early morning dispatch call about an unknown disturbance at a nearby Safeway. On arrival, he found the victim sitting outside the store. During their conversation, the victim relayed the following:

- She and her boyfriend, whom she identified as "Lester Gulley," had been in an on-again, off-again relationship for approximately two years, but they broke up earlier that morning after arguing for most of the previous night.[1]

- The victim asked "Lester" to leave her apartment that morning, but he initially refused and only left after the victim pretended to call 911.

---

[1] Officer Henderson later learned that "Lester Gulley" was one of several aliases Condon used and was not the perpetrator's true name.

- While the victim was placing personal belongings in her car, "Lester" reappeared. Despite her pleas to leave her alone, "Lester" followed the victim as she ran through a parking lot and entered Safeway seeking to "get away from him."

- The victim and "Lester" had an unhealthy relationship and were "always fighting." In the last couple of weeks, "Lester" had grabbed her neck, dug his nails into her, and given her a black eye.

- The victim asked Henderson questions about the process of filing a restraining order or some other action to protect herself, stating, "I have kids and I don't want them to be around [this]."

- The victim was concerned with "Lester" learning that she had talked with police because, following prior incidents, he had threatened her and said she knew "what[] [was] going to happen" if she were to call the police and that he "kn[e]w people who ha[d] guns."

¶ 12    During Officer Henderson's interview with the victim, she pulled down her shirt to show him "marks from someone's

fingernails" and bruising on her neck and collarbone. He observed that the victim was "agitated and scared," explaining that her reaction appeared similar to his observations of other victims of violence. Following the interview, he gave the victim a ride back to her apartment where he "observed other elements of a crime with damaged property." At that point, Officer Henderson issued a warrant for "Lester Gulley's" arrest.

¶ 13     *Incident 2: December 8, 2018.* Officers Henderson and Starz responded to a dispatch call concerning domestic violence and strangulation. On arrival, the officers began to interview the 911 caller:

- The victim recognized Officer Henderson as the responding officer during the incident on November 3.

- She identified the perpetrator as Andrew Condon. An officer sought to clarify whether the call that day concerned the same male as the incident on November 3, and she confirmed that it did. She used Condon's alias during the previous incident because he did not want her to tell people his real name because "[he'd] rather die than go back to prison."

6

- The victim displayed scratches on her back, bruising on her neck and collarbone, and red marks in one of her eyes. Her voice was scratchy, which she stated was not normal.

- The victim explained that after an argument concerning finances turned violent, Condon forced her backwards onto her couch, mounted her, and wrapped his hands around her neck restricting her ability to breathe or talk. She did not lose consciousness, but she recalled her vision went dark as Condon strangled her. She demanded that Condon get off, but he replied by requiring the victim to "say please" and "do whatever [he] sa[id]."

- She said a similar event occurred "a couple weeks ago" when Condon grabbed the front of her throat.

- The victim said that after Condon released his grip, she retreated to her bedroom closet and called 911. She kept her phone concealed and pretended she was calling her father to prevent Condon from knowing she was contacting police.

7

- She told the officers that there was an active warrant for Condon's arrest, but she could not provide any details. She did not indicate whether Condon was aware of the existing warrant.

¶ 14　After the parties presented evidence, the court concluded that (1) the victim's statements to police bore sufficient guarantees of trustworthiness to be admissible under CRE 807, and (2) the prosecution established by a preponderance of the evidence that the statements were admissible under the forfeiture by wrongdoing doctrine.

¶ 15　Although the court noted that further argument would be needed to sort through the victim's various statements, it determined that the statements were generally admissible under CRE 807. In finding that the victim's statements bore sufficient guarantees of trustworthiness, the court emphasized that during the November 3 incident, the victim spoke to police after a store employee called law enforcement, and the interaction made clear that the victim was not seeking action by the police but, rather, was concerned about her personal safety. Concerning the second incident on December 8 the court conceded that the victim knew

Officer Henderson from the first encounter, but that they did not have any real relationship outside of their interaction a month earlier. And the court noted again that the victim did not appear to be requesting specific action by the police but rather was motivated by "getting safety or getting [a] protection order in place and how to go about doing that."

¶ 16 In concluding that the statements were admissible under the forfeiture by wrongdoing doctrine, the court found that (1) the victim was unavailable; (2) Condon's conduct brought about the victim's unavailability; and (3) Condon acted with the intent to deprive the criminal justice system of evidence. The court highlighted Condon's threats to the victim should she call 911 and the victim's efforts to conceal Condon's identity and prevent him from knowing she had spoken with police.

## B. Hearsay

¶ 17 Condon contends that the district court erred by applying the incorrect legal standard when it admitted the victim's statements under CRE 807. We disagree.

### 1. Standard of Review and Applicable Law

¶ 18　Trial courts have broad discretion to determine the admissibility of evidence, including the application of the residual hearsay exception. *People v. McFee*, 2016 COA 97, ¶ 17. Thus, while we review a court's application of hearsay law de novo, *People v. Martinez*, 2024 COA 34, ¶ 54, we review its evidentiary rulings for an abuse of discretion, *People v. Whitman*, 205 P.3d 371, 381 (Colo. App. 2007). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or when it applies an incorrect legal standard. *People v. Allgier*, 2018 COA 122, ¶ 43.

¶ 19　Hearsay is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay is not admissible unless an exception is provided by rule or statute. CRE 802.

¶ 20　The residual hearsay rule in CRE 807 is one such exception. Statements that are not covered by an exception established in CRE 803 and 804 are admissible under CRE 807 when the statement has "equivalent circumstantial guarantees of trustworthiness," and a court finds that

(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

CRE 807; *McFee*, ¶ 18 (quoting CRE 807).

¶ 21     To determine the trustworthiness of challenged statements, "courts should examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made." *People v Brown*, 2014 COA 155M-2, ¶ 20 (quoting *People v. Jensen*, 55 P.3d 135, 139 (Colo. App. 2001)). The evidence's proponent must establish the statements' trustworthiness by a preponderance of the evidence. *Id.*

2.     The Victim's Out-of-Court Statements were Admissible Under CRE 807

¶ 22     Condon contends that the district court erred by admitting the victim's statements under CRE 807 because it applied the incorrect legal standard. We discern no basis to reverse.

11

¶ 23    Condon argues, and we agree, that the court's findings concerning CRE 807 focused exclusively on whether the statements bore sufficient guarantees of trustworthiness but did not include analysis regarding whether (1) the statements were offered as evidence of a material fact; (2) the statements were more probative on the matter for which they were offered than any other evidence which the proponent could procure through reasonable efforts; and (3) the general purposes of these rules and the interests of justice were best be served by admitting the statements into evidence.  *See* CRE 807; *McFee*, ¶ 18.  However, reviewing courts may nevertheless analyze "the admissibility of hearsay statements under [the residual hearsay exception] in cases in which trial courts failed to make on-the-record findings, or based their rulings on other grounds." *People v. Fuller*, 788 P.2d 741, 745 (Colo. 1990).  In conducting the analysis, we conclude that the victim's statements were admissible under CRE 807.

¶ 24    We first agree with the court's conclusion that the victim's statements bore sufficient guarantees of trustworthiness.  Because the statements were made (1) to police officers whom the victim did not know; (2) out of a motivation to ensure her safety rather than to

bring about criminal charges against Condon; and (3) while the victim was in an excited state and so closely removed from the confrontation, we are satisfied that her statements exhibited a sufficient indicia of reliability to satisfy CRE 807's requirements. *See Brown*, ¶ 20; *Vasquez v. People*, 173 P.3d 1099, 1106 (Colo. 2007).

¶ 25    We further conclude that the victim's statements satisfy the remaining prerequisites under CRE 807.  *See McFee*, ¶ 18.

¶ 26    As to materiality, the victim's statements concerning her and Condon's relationship and the domestic violence that permeated it was relevant to a material fact at issue in Condon's trial.  *See id.*  At a trial in which Condon was charged with strangling and killing the victim, evidence that he had previously assaulted the victim in a similar manner provides important context to the jury concerning the escalating cycle of domestic violence in the couple's relationship and Condon's motive and culpable mental state.  *See Jensen*, 55 P.3d at 140 ("In a homicide trial, evidence of prior threats, mistreatment, or malice by the defendant toward the victim is admissible to show the defendant's motive and culpable mental state.").

¶ 27    Regarding necessity, because the prior altercations between Condon and the victim occurred in private without any known witnesses, and the victim is now deceased, the victim's statements about Condon's prior conduct were more probative than any other evidence the prosecution could have procured to that end. *See McFee*, ¶ 18.

¶ 28    Finally, concerning the interests of justice, we conclude that the interests of justice were best served by admitting the victim's statements into evidence. *See id.* Because the victim was deceased at the time of trial and no other witnesses were able to provide similarly intimate accounts of the couple's relationship or the cycle of Condon's abuse, admitting the victim's statements ensured that the complete facts surrounding the incidents were available to the jury. *See Jensen*, 55 P.3d at 140 ("[T]he interests of justice are also promoted by having the complete facts surrounding an incident available to the jury.").

¶ 29    Thus, while the court's findings did not fully articulate its basis for admitting the evidence under CRE 807, we conclude that the victim's statements to police on November 3 and December 8 were admissible under the rule and that the court did not abuse its

discretion.  *See People v. Quintana*, 882 P.2d 1366, 1375 (Colo. 1994); *Whitman*, 205 P.3d at 381.

### C.  Confrontation Rights

¶ 30   Condon contends that the district court erred and violated his Sixth Amendment right to confrontation by admitting the victim's testimonial statements into evidence.  We disagree.

### 1.  Standard of Review and Applicable Law

¶ 31   "We review de novo a defendant's claim that the trial court violated his Confrontation Clause rights, applying the constitutional harmless error standard to any error."  *People v. Johnson*, 2019 COA 159, ¶ 49, *aff'd*, 2021 CO 35.

¶ 32   Pursuant to the Sixth Amendment of the United States Constitution, "admitting testimonial hearsay at trial, absent the unavailability of the declarant and a prior opportunity for cross-examination by the defendant, violates the defendant's" right to confrontation.  *Vasquez*, 173 P.3d at 1103.  But a criminal defendant can lose his right to confrontation under the forfeiture by wrongdoing doctrine.  *Id.*

¶ 33   Under the doctrine, a defendant forfeits his right to confront a witness at a proceeding in which the witness's statements are

15

otherwise admissible if "(1) the witness is unavailable; (2) the defendant was involved in, or responsible for, procuring the unavailability of the witness; and (3) the defendant acted with the intent to deprive the criminal justice system of evidence." *Id.* at 1104. Critically, "preventing the witness's testimony does not have to be the defendant's sole motivation, but need be only one reason for the defendant's actions." *Id.* at 1104-05. The doctrine applies only when each element is proven by a preponderance of the evidence. *Id.* at 1101.

2.   Condon Forfeited his Confrontation Rights

¶ 34    Condon contends that the district court erred by determining that he forfeited his Sixth Amendment right to confrontation under the forfeiture by wrongdoing doctrine. He argues that the prosecution failed to establish by a preponderance of the evidence that he procured the victim's unavailability with the intent to deprive the criminal justice system of evidence. We disagree.

¶ 35    At the pretrial evidentiary hearing, the court determined that Condon acted, at least in part, with the intent to deprive the criminal justice system of evidence. In so concluding, the court emphasized the threats that Condon had levied against the victim if

16

she were to contact law enforcement — namely, his threat that the victim knew "what[] [was] going to happen" if she were to call the police, that he "kn[e]w people who ha[d] guns," and that he made the victim refer to him with an alias because "[he'd] rather die than go back to prison." The court also cited the victim's threat to call 911 during the incident on November 3 and then her attempt to conceal her call to 911 on December 8 as further circumstantial evidence that Condon's conduct was motivated, at least in part, by the requisite intent.

¶ 36 The court acknowledged that the evidence was not such that Condon clearly said, "I understand that you called the police on this particular date and talked to them. And because of this, this is what is happening." It explained that when "looking at all the pieces of the puzzle" — Condon's threats to the victim, his use of an alias, and the victim's expressed fears about contacting police — the court was satisfied that the prosecution had met its burden of proof.

¶ 37 We agree and similarly conclude that the prosecution met its burden to prove by a preponderance of the evidence that Condon, at least in part, acted with the requisite intent to deprive the criminal

17

justice system of evidence. *See Vasquez*, 173 P.3d at 1101. Also, our review of the record supports the court's factual findings, and we will not disturb them. *See People v. Jackson*, 2018 COA 79, ¶ 44 ("[T]he trial court, as fact finder, was in the best position to weigh the credibility of the witnesses and evidence presented, and we defer to its findings because the record supports them."), *aff'd on other grounds*, 2020 CO 75. Thus, we perceive no error.

### III. Condon's Motion to Sever

¶ 38    Condon contends that the district court erred by denying his motion to sever charges brought by the prosecution into two separate trials. We disagree.

### A. Additional Background

¶ 39    Based on evidence that Condon had murdered the victim, dumped her body, and stolen her car and debit card between December 21 and 24, 2018, the prosecution charged Condon with first degree murder, tampering with a deceased human body, aggravated motor vehicle theft, and a crime of violence (sentence enhancer) (counts 1–4). The prosecution later amended its complaint to include charges stemming from a prior strangulation

incident that occurred on December 8, adding charges of burglary, assault, and menacing (counts 5–7).

¶ 40 Condon moved to sever counts 5–7, arguing that the two sets of charges involved separate and distinct criminal episodes. The prosecution responded by arguing that (1) both incidents involved the same victim; (2) the assault on December 8 and the victim's murder both occurred in the victim's apartment within two weeks of one another; (3) the basis of the separate charges resulted from similar conduct; and (4) the charges were based on conduct that would be cross-admissible if the counts were severed, as each case would require many of the same facts and testimony from several of the same witnesses.

¶ 41 The court denied Condon's motion to sever, finding that (1) the two sets of charges were of a similar character; (2) they were connected by a common scheme or plan; and (3) the evidence used to prosecute the charges arising from the December 8 incident would be admissible at Condon's murder trial under Rule 404(b).

B.    Applicable Law and Standard of Review

¶ 42 Crim. P. 8(a)(2) permits the permissive joinder of two or more offenses in the same indictment if they are (1) "of the same or

similar character"; (2) "based on two or more acts or transactions connected together"; or (3) based on two or more acts or transactions "constituting parts of a common scheme or plan." *Buell v. People*, 2019 CO 27, ¶ 18 (quoting Crim. P. 8(a)(2)).

¶ 43     A defendant may be granted relief from joinder if "it appears that a defendant or the prosecution is prejudiced by a joinder of offenses." Crim. P. 14. "[A] defendant may demonstrate prejudice by showing, among other things, that 'consolidation caused actual prejudice and that the jury was not able to separate the facts and legal principles applicable to each case.'" *Buell*, ¶ 31 (quoting *People v. Gross*, 39 P.3d 1279, 1282 (Colo. App. 2001)). Prejudice is generally not established when the evidence of each incident would have been admissible in separate trials. *Id.*

¶ 44     We review a trial court's decision to deny a motion to sever for an abuse of discretion. *Bondsteel v. People*, 2019 CO 26, ¶ 32. A trial court abuses its discretion where its decision is manifestly arbitrary, unreasonable, or unfair or when it applies an incorrect legal standard. *Allgier*, ¶ 43.

## C. The District Court Did Not Abuse its Discretion by Denying Condon's Motion to Sever

¶ 45 Condon contends that the district court abused its discretion by denying his motion to sever because the two sets of charges do not satisfy a basis for permissible joinder under Crim. P. 8(a)(2). Alternatively, he argues that even if joinder was permissible under Crim. P. 8(a)(2), he was prejudiced by the joinder of charges and thus was entitled to relief under Crim. P. 14. We disagree.

¶ 46 We agree with the court's conclusion that the charges related to Condon's conduct on December 8 are of the same or similar character as those based on Condon's murder of the victim. In assessing whether two cases are of a "same or similar character," courts should "consider[] factors such as the elements of the offenses at issue, the temporal proximity of the underlying acts, the likelihood that the evidence will overlap, the physical location of the acts, the modus operandi of the crimes, and the identity of the victims." *Bondsteel*, ¶ 38.

¶ 47 The charges from the December 8 incident and the victim's eventual murder (1) involved similar conduct, including strangulation and the theft or destruction of the victim's property;

(2) were part of a related and escalating cycle of domestic violence between Condon and the victim; and (3) were alleged to have occurred at the victim's apartment within a three-week period. Against this backdrop, the charges stemming from the two incidents satisfy Crim. P. 8(a)(2)'s requirements. *See Buell*, ¶ 23 (finding that the requirements of permissive joinder were satisfied when the defendant stole from two retail stores in the same city within two and a half months of one another by hiding the merchandise in his clothing).

¶ 48 We also conclude that Condon is not entitled to relief from the joinder of his charges under Crim. P. 14. First, as the court observed, even if it had severed the charges, evidence of Condon's conduct on December 8 would likely have been admissible at the trial for his murder of the victim. *See* § 18-6-801.5(1), C.R.S. 2025 (evidence of similar transactions of domestic violence is necessary in some situations to prosecute such crimes); *Buell*, ¶ 31 (prejudice is generally not established when evidence of each incident would be admissible in separate trials).

¶ 49 Moreover, the record contains no evidence that the jury was unable to separate the facts and legal principles applicable to each

22

case. *See id.* The jury was properly instructed that "the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count." And unless there is evidence to the contrary, we presume the jury followed the court's instructions. *People v. Cousins*, 181 P.3d 365, 374 (Colo. App. 2007). We conclude that the court did not abuse its discretion by denying Condon's motion to sever counts 1–4 from counts 5–7. *See Allgier*, ¶ 43.

## IV.    Evidence of Prior Acts

¶ 50    Condon contends that the district court erred by admitting evidence of Condon's prior acts without conducting the appropriate analysis under CRE 404(b). We are not convinced.

### A.    Additional Background

¶ 51    Before trial, the prosecution filed notice of its intent to introduce the following evidence of similar transactions to show Condon's motive, malice towards the victim, intent, knowledge, and lack of mistake:

- *Incident 1: Approximately October 1, 2018 – November 3, 2018.* When Officer Henderson interviewed the victim outside of Safeway on November 3, the victim stated that

Condon had grabbed her neck, dug his nails into her, and given her a black eye in the last couple of weeks.

- *Incident 2: Approximately October 1, 2018 – November 3, 2018.* When Officers Henderson and Starz responded to the victim's apartment on December 8, the victim stated that Condon grabbed the front of her throat "a couple weeks ago."

¶ 52 Condon argued that the evidence was inadmissible because "the probative value of the proposed 404(b) evidence [was] substantially outweighed by the danger of unfair prejudice to Mr. Condon."

¶ 53 The court disagreed and determined that the proffered evidence was admissible under CRE 404(b). It concluded that (1) the proffered evidence was related to a material fact because it evidenced Condon's motive, malice toward the victim, intent, and knowledge; (2) the evidence was logically relevant to the material facts for which it was admitted; (3) the evidence was logically independent from the prohibited inference that the defendant had a bad character; and (4) the evidence's probative value outweighed the danger of unfair prejudice.

B. Standard of Review and Applicable Law

¶ 54 We review a trial court's decision to admit or exclude other acts evidence under CRE 404(b) for an abuse of discretion. *People v. Jones*, 2013 CO 59, ¶ 11. A trial court has substantial discretion when deciding whether to admit other acts evidence, and we will disturb its decision only if it was manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 55 Other acts evidence is excluded by Rule 404(b)(1) when its only logical relevance depends on the inferences that (1) a defendant's prior misconduct shows his or her bad character; and (2) the defendant, due to that bad character, thus engaged in the wrongful conduct at issue. *People v. Shores*, 2016 COA 129, ¶ 33 (citing *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990)). But such evidence is not necessarily barred if it is offered for another purpose, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. CRE 404(b)(2); *Masters v. People*, 58 P.3d 979, 995 (Colo. 2002).

¶ 56 The admissibility of other acts evidence under Rule 404(b) is governed by *Spoto*, 795 P.2d at 1318. The *Spoto* analysis requires the court to determine that (1) the evidence relates to a material

fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the intermediate inference that the defendant was acting in conformity with his bad character; and (4) the evidence's probative value is not substantially outweighed by the danger of unfair prejudice. *Spoto*, 795 P.2d at 1318.

¶ 57 The General Assembly has found that "domestic violence is frequently cyclical in nature, involves patterns of abuse, and can consist of harm with escalating levels of seriousness" and has expressly recognized "that evidence of similar transactions can be helpful and is necessary in some situations in prosecuting crimes involving domestic violence." § 18-6-801.5(1). So a prosecutor may proffer such evidence "to show a common plan, scheme, design, identity, modus operandi, motive, or guilty knowledge or for some other purpose." § 18-6-801.5(3).

### C. The District Court Did Not Abuse Its Discretion by Admitting Evidence of Condon's Prior Conduct

¶ 58 Condon contends that the district court erred by admitting evidence of Condon's prior conduct without first performing the required *Spoto* analysis. He argues that the court failed to make adequate findings concerning how the proffered evidence

26

"established motive, malice toward the victim, intent, [and] knowledge" because the findings the court made were conclusory and failed to "explain[] how the other act evidence related to any of the charges or how the other act evidence [was not] simply [used for the purpose of] propensity." Based on our record review, we conclude that the court made specific findings as to each *Spoto* factor, and we reject Condon's contention.

¶ 59 Regarding the first *Spoto* factor, the court explained that evidence relating to prior acts of domestic violence carried out by Condon against the victim was relevant to show Condon's "motive and malice toward the victim as well as proving the defendant's intent and knowledge," particularly because instances of domestic violence "all typically look very similar in nature [and usually

involve] similar set[s] of actions, reactions[,] and patterns."[2] *See Spoto*, 795 P.2d at 1318.

¶ 60    In analyzing the second *Spoto* factor, the court concluded that evidence of Condon's prior instances of domestic violence against the victim was logically relevant to Condon's motive, malice toward the victim, intent, and knowledge. *See id.* The court cited the proffered evidence's relevance to "the escalation of the alleged violence between each of these incidents [that] ultimately culminat[ed] in the allegations . . . in this particular case." The court also explained that the evidence was particularly probative in light of the prior incidents being so closely temporally related to the victim's murder.

¶ 61    Regarding the third *Spoto* factor, the court observed that it is generally difficult to articulate how prior acts evidence is

---

[2] Condon contends that the court failed to conduct any *Spoto* analysis concerning whether the evidence was admissible to show lack of mistake. But during the evidentiary hearing, the court agreed with Condon that such a basis for admission is better assessed "once we see where we are at in trial" and deferred judgment to that end. Thus, the court did not identify Condon's lack of mistake as a relevant basis for admission at the time it conducted its *Spoto* analysis during the evidentiary hearing, and, therefore, it was not required to make findings to that end.

"independent of the prohibited inference that the defendant has a bad character," especially in instances such as here when "you are dealing with other potential uncharged criminal acts." But the court found that the logical relevance of the prosecution's proffered evidence was in fact independent of that inference. It explained that the evidence was being produced not "for the purpose of just simply demonstrating that the defendant has a bad character . . . [b]ut rather for the purposes set forth as the court previously discussed."

¶ 62 Finally, the court concluded by finding that the proffered evidence satisfied the fourth *Spoto* factor — namely, the court found that "the probative value of this evidence d[id] in fact outweigh the danger of unfair prejudice." *See id.* While it observed that the "evidence [wa]s [clearly] prejudicial," the court noted that "we don't usually have a situation where someone announces their intent" when they perform a particular act, so it "is often something that has to be discerned from the circumstances and is often circumstantial in nature." Because the incidents were carried out so closely together, and because the evidence provided the jury with important context into the escalation of domestic violence between

Condon and the victim, the court concluded that admitting the evidence was not precluded by unfair prejudice.

¶ 63 In the end, the record reflects that the court appropriately analyzed the proffered evidence under CRE 404(b) and *Spoto*. Thus, we conclude that it did not abuse its discretion by permitting the jury to hear evidence of Condon's prior acts of domestic violence against the victim. *See Spoto*, 795 P.2d at 1318; *Jones*, ¶ 11.

## V. Heat of Passion Jury Instruction

¶ 64 Condon contends that the district court erred by failing to include an interrogatory concerning heat of passion provocation in its jury instructions for second degree murder. We perceive no error.

### A. Additional Background

¶ 65 At trial, Condon tendered a proposed interrogatory concerning heat of passion provocation for second degree murder. As a basis for the tendered interrogatory, Condon's counsel cited two text messages that Condon had sent to a friend in the twenty-four hours leading to the victim's murder. The first message, sent on December 20 at 9:20 p.m., said, "Girl I let her brother box my face for my respect . . . . [S]he's an evil person she don't deserve me

period." The second message, sent at 10:49 a.m. the following morning, said that "[the victim's] brothers jumped me I need rev [sic]." Condon's counsel argued that the text messages amounted to sufficient evidence that Condon strangled the victim following "a serious and highly provoking act."

¶ 66 But the prosecutor explained that the victim called out sick from work at approximately 7:00 a.m. on December 21, so she was still alive when Condon sent the first message. The prosecutor argued that (1) the evidence did not show that Condon experienced a "sudden and provoking heat of passion," and (2) Condon, in the approximately eleven hours between the first message and the victim calling out from work, had sufficient time to temper any heated passion that resulted from his alleged altercation with the victim's brothers.

¶ 67 The court denied Condon's tendered interrogatory, finding that the trial evidence did not support the conclusion that Condon experienced a sudden and provoked heat of passion. It explained that the provoking act was seemingly performed by the victim's brother, not the intended victim, and that Condon had an adequate opportunity to reflect considering he had time to send a series of

text messages to his friend about the altercation. The court also observed that Condon's message — specifically, his statement, "I need rev [sic]" — reflects a premeditated action that has yet to occur, not a sudden provocation "that takes place within seconds of the act."

B. Applicable Law and Standard of Review

¶ 68    "Trial courts have a duty to instruct the jury on all matters of law applicable to the case." *Roberts v. People*, 2017 CO 76, ¶ 18. When considering whether a defendant is entitled to a requested instruction, we view the evidence in the light most favorable to giving the instruction. *People v. Tardif*, 2017 COA 136, ¶ 22. A defendant is entitled to an instruction on a particular affirmative defense when he raises some credible evidence to support it — regardless of how incredible, unreasonable, improbable, or slight it may be. *Cassels v. People*, 92 P.3d 951, 955 (Colo. 2004).

¶ 69    "We review jury instructions de novo to determine whether they accurately inform the jury of the governing law." *McDonald v. People*, 2021 CO 64, ¶ 54 (quoting *Hoggard v. People*, 2020 CO 54, ¶ 12). And we review a trial court's decision to give or not to give a particular jury instruction for an abuse of discretion. *Id.* A court

abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or when it applies an incorrect legal standard. *Allgier*, ¶ 43.

C.     Condon Was Not Entitled to a Heat of Passion Interrogatory

¶ 70     Condon argues that the trial record contains some credible evidence to justify including the heat of passion interrogatory in the jury instruction regarding the lesser included offense of second degree murder. We disagree.

¶ 71     Second degree murder is a class 2 felony, unless a defendant proves that his conduct was performed upon a sudden heat of passion. § 18-3-103(3)(b), C.R.S. 2018. To receive a heat of passion provocation instruction, the defendant must present some credible evidence that (1) the offense was performed upon a sudden heat of passion; (2) the offense was caused by a serious and highly provoking act of the victim; (3) the provoking act was sufficient to excite an irresistible passion in a reasonable person; and (4) an insufficient amount of time passed between the provocation and the offense for the voice of reason and humanity to be heard. *Id.*; *Tardif*, ¶ 22. "All four elements must find support in the evidence

33

before a defendant is entitled to submit the provocation issue to a jury." *People v. Villarreal*, 131 P.3d 1119, 1128 (Colo. App. 2005).

¶ 72 We conclude that the trial evidence was insufficient to entitle Condon to a heat of passion provocation instruction for two reasons. *See Tardif*, ¶ 22.

¶ 73 First, Condon's messages clearly allege that the provoking act was performed by the victim's two brothers, not the intended victim. *See id.* Condon argues that the evidence suggests "the beating was at her behest or because of Condon's behavior toward her," but the record does not support his argument. Condon's message explicitly said, "I let her brother box my face," not "[the victim] let her brother box [Condon's] face." Second, the time that elapsed between Condon sending the first message and the victim calling out from work the following morning indicates that Condon did not strangle the victim in "a sudden heat of passion," nor that "an insufficient amount of time passed for the voice of reason and humanity to be heard." *Id.* So the court did not abuse its discretion by denying Condon's tendered interrogatory. *See McDonald*, ¶ 54.

## VI.    Prosecutorial Misconduct

¶ 74    Condon contends that the prosecutor committed misconduct by misstating the evidence during closing argument.  We disagree.

### A.    Additional Background

¶ 75    At trial, the prosecution offered expert testimony regarding strangulation.  A forensic pathologist testified that when enough pressure is applied to an individual's neck, they "will typically go unresponsive within seconds."  Once unresponsive, so long as pressure is continually applied, "that individual will pass into what's called the point of no return."  That means that "once the pressure is released from the neck, that person . . . would need some sort of medical intervention in order to be resuscitated."  The pathologist conceded that one cannot say for certain how long pressure need be applied for the average person to reach the point of no return, but he estimated it could take "five, [thirty], [or sixty] seconds" of continuous pressure after the individual becomes unresponsive.

¶ 76    During closing argument, the prosecutor explained that on December 8, the victim estimated that Condon strangled her for approximately twenty seconds but that she did not recall becoming

unresponsive. The prosecutor then recounted the pathologist's testimony, arguing that it can take "somewhere between [thirty] seconds to a minute for a person to reach the point of no return." Condon's counsel objected that the prosecutor's argument was a "[m]isstatement of the evidence." The court permitted the prosecutor to continue but advised "the jury to rely on their collective memory during deliberations regarding the testimony presented."

¶ 77 The prosecutor concluded by arguing that, if the victim did not become unresponsive after twenty seconds of strangulation, "let's say [it is] [thirty] seconds . . . until she goes unconscious. [And] [a]nother thirty seconds to a minute until she reaches the point of no return . . . . That's at least a minute and [thirty seconds] with his hands wrapped around her throat." The prosecutor supplemented her argument with a PowerPoint slide.

B. Standard of Review and Applicable Law

¶ 78 We engage in a two-step analysis when reviewing prosecutorial misconduct claims. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we examine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* If

improper, we determine whether that conduct warrants reversal according to the proper standard of review. *Id.*

¶ 79    A prosecutor may comment on the evidence admitted and the reasonable inferences that can be drawn therefrom. *People v. McMinn*, 2013 COA 94, ¶ 61. But a prosecutor may not misstate or misinterpret the law or refer to facts not in evidence. *Id.* at ¶ 62. Arguments delivered in the heat of trial are not always perfectly scripted, so we grant prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful. *Id.* at ¶ 60. When reviewing whether a prosecutor committed misconduct during closing argument, we also give prosecutors wide latitude in the language and style they employ and in replying to opposing counsel's argument. *Id.*

### C.    The Prosecutor's Statements During Closing Argument Were Not Misconduct

¶ 80    Condon next contends that the prosecutor repeatedly misstated the pathologist's testimony regarding the time required to strangle someone to the point of no return. He argues that the pathologist testified one could become unconscious within seconds of pressure being applied to the neck but that he could not give an

37

estimate of the time it takes to strangle someone to the point of no return.  Based on this testimony, Condon argues that "the prosecutor's thirty- to sixty-second timeframe was wrong and a misstatement of the evidence."  We are not convinced.

¶ 81    Granted, the pathologist's testimony did not provide a precise time estimate for one to reach the point of no return after becoming unresponsive.  But in the end, he testified that it could take anywhere from "five, [thirty], [or sixty] seconds" to reach the point of no return.  Thus, considering the pathologist's testimony and the victim's statement about the altercation on December 8, the prosecutor reasonably inferred that if (1) the victim became unresponsive after thirty seconds of Condon applying pressure to her neck, and (2) it took another thirty to sixty seconds of pressure for the victim to reach the point of no return, then Condon may have strangled the victim for a total of sixty to ninety seconds on the morning that she died.

¶ 82    So we conclude that the prosecutor's theory constituted a reasonable inference based on the trial evidence.  *See Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005) ("The prosecutor should not intentionally misstate the evidence or mislead the jury

38

as to the inferences it may draw." (quoting A.B.A. Standards for Crim. Just.: Prosecution Function & Defense Function § 3-5.8(a) (3d ed. 1993)))  And based on the totality of the circumstances, we perceive no misconduct.  *See Wend*, 235 P.3d at 1096.

## VII.   Cumulative Error

¶ 83      Finally, Condon argues that reversal is warranted under the cumulative error doctrine.  To reverse based on cumulative error, we "must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not."  *Howard-Walker v. People*, 2019 CO 69, ¶ 25.

¶ 84      We need not conduct a cumulative error analysis because we have concluded that the district court did not err.  *See People v. Conyac*, 2014 COA 8M, ¶ 152 ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

## VIII.  Disposition

¶ 85      We affirm the judgment of conviction.

JUDGE FOX and JUDGE MEIRINK concur.